In re BERWIND–WHITE COAL MIN. CO. ALLEN N. SPOONER & SONS, Inc. v. GARDNER.

AMBOY TOWBOATS, Inc. v. PITNEY et al.

BERWIND–WHITE COAL MIN. CO. v. PITNEY et al.

CLEARY BROS. v. UNITED STATES et al.

United States District Court S. D. New York.

April 22, 1948.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Frederic Conger, both of New York City, of counsel), for Berwind-White Coal Mining Co.

John F. X. McGohey, U. S. Atty., of New York City (J. F. Quarto, Sp. Asst. to U. S. Atty., of New York City, of counsel), for United States of America.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald J. McKernan and Martin J. McHugh, both of New York City, of counsel), for Allen N. Spooner & Sons, Inc. and Tracy Towing Line, Inc.

Pyne, Lynch & Smith, of New York City (Warner Pyne, of New York City, of counsel), for Amboy Towboats, Inc. and Tug St. Charles.

Foley & Martin, of New York City (C. E. Heckman and J. R. Stewart, both of New York City, of counsel), for Cleary Bros.

John J. McElhinny, of New York City, for Trustees of The Central R. R. Co. of N. J.

CLANCY, District Judge.

Pier 18 of the Central Railroad of New Jersey is on the New Jersey shore below the Battery. Berwind-White Coal Mining Company knew it was a busy pier day and night, loading about five hundred boats monthly and frequently twenty-five or more in a single day. Upon it is a mechanical dumper used to load barges with coal brought onto the pier in railroad cars. The barges are brought light to the shore or westerly end of the pier by tugs and, when the loading crew is ready for the loading operation, are towed easterly along the face of the pier by a cable operated by a winch. After loading, the barges are again towed by another winch—the horsepower of either winch does not appear—easterly about 250 feet to make room for the next barge to be loaded.

At five o'clock in the afternoon of the 15th of November, 1944, the barge Eureka No. 110, which had lain at the north side of pier 18 since the afternoon of the previous day, was brought by a tug to the south side of the pier. It had come from the power-house in the East River to which apparently was delivered its last load taken aboard

November 8th. It was light, having only twenty-five tons of coal aboard and was tied bow in on the south side of the pier so the barge's starboard side was along the pier. At 7 o'clock the barge was towed by the towing cable to a position under the dumper. The bargee had then made no inspection or examination of the barge. The loading operation required one hour and fifteen minutes and almost fourteen hundred tons, approximately her full capacity, were put aboard. After loading was completed at about 8:15 she was again brought seaward by the winch and the cable then tied to her starboard stern quarter cleat, along the face of the pier to the outshore position which loaded barges occupied. This motion when imparted to the towing cable would take the Eureka No. 110's bow off the pier. When loaded the barge had a free board of two feet. Some time after the barge was moored at this position at the bay end of the pier her captain sounded and found 11 inches of water after which he started the pump on the barge. Some time thereafter he sounded again and discovered 18 inches of water. Thereupon he went ashore to ask the help of the dock foreman in procuring the assistance of a tug.

In response to his request the shifting tug Walter Tracy appeared on the scene about 9 P.M. and attempted to move the barge from her berth but was unsuccessful; two lines which the Walter Tracy put on the barge parted. At this time the Central Railroad of New Jersey tug Allentown was at the end of pier 5 awaiting orders. She received orders to proceed to pier 18 to give further assistance to the Eureka No. 110 and arrived alongside the Eureka No. 110 some ten or fifteen minutes later. She spent ten minutes attempting to syphon the barge but this proved fruitless. She then put a bow line on the barge and backed away from pier 18 in the direction of mud flats which were located south and southeast of the pier. The Allentown succeeded in getting the stern of the barge on the flats but the bottom's grasp was insufficient to hold. The tug then pushed the bow around so that the stern was facing the channel with the bow down river at which point the barge sank, sliding back into the deep water in the channel. The sinking occurred at 10 P.M. The captain of the Allentown hung a lantern on a pole which stood above the water and started for the pier. But the pole was fixed to the false roof of the Eureka No. 110's cabin which floated free immediately after the lantern was placed. It was towed to pier 18 by the Allentown at about ten twenty. All of the Allentown's service to the barge was rendered at the bargee's request and, though probably the towing was at the tug's discretion which the bargee had invited, it was for the barge's benefit. The Allentown then proceeded to pier 5, arriving at 10:45 P.M. when her captain informed the railroad tug dispatcher that the barge had sunk and was lying 300 feet south of pier 18. This information was relayed by the tug dispatcher to the Coast Guard at 10:55 P. M. No attempt to mark the sunken barge was thereafter made either by her owner or by the railroad.

After leaving the leaking Eureka No. 110 at the dock's side her bargee telephoned the duty man of Berwind-White Coal Mining Company who was stationed at pier 8 Jersey City, requesting that he notify Mr. Nelson, the night superintendant of Berwind-White Coal Mining Company, of the events and have men and a pump sent to pier 18. He was on the pier at 10:20 when the Allentown returned with the false roof. He knew then his barge had sunk but he did nothing but stand on the pier. He did not communicate the news of the sinking to his superiors then or ever. Two employees of Berwind-White Coal Mining Company arrived on the pier with a pump at about 10:30 P.M. There they were informed that the barge had sunk and that the sinking would be reported to the Coast Guard and they left the pier at 10:45 after telling this to Mr. Nelson. More than an hour after it was given the news, the Coast Guard at the Battery dispatched a patrol boat to the scene of the sinking where it arrived at 12:35 A.M. The location of the wreck given the Coast Guard by the railroad was wrong. The wreck was buoyed by the Coast Guard at ten o'clock on the morning of November 16.

At approximately 12:35 in the morning of November 16th the tug Ann Marie Tracy

ran upon the unmarked sunken wreck, striking it at a position that was estimated as about 150 feet off the end of pier 18 and was damaged thereby. The Coast Guard was just then arriving and had not undertaken patrol.

At approximately 5:10 A.M. on November 16th the tug St. Charles, with three light barges in tow struck the sunken wreck, causing damage to tug and a barge. The tug was notified by the Coast Guard that a sunken wreck was at a place estimated by the tug captain to be 150 feet off the end of pier 18. This information was incorrect and when he attempted a port maneuver to avoid the spot fixed by the Coast Guard the tug brought up on the wreck and, the barges propelled by the tide and their momentum, struck the tug whereby one of the barges, The Cleary No. 72, was damaged and the tug further damaged.

At approximately 8:30 A.M. the tug Osprey ran upon the wreck at a place estimated as 200 feet off and abreast pier 18 and was thereby damaged. No Coast Guard vessel was then present at the scene.

High water on the 15th of November was at 8:58 P.M. and low water was at 3:15 on that afternoon. At 8:15 P.M. in the evening of the 15th the height of the tide above mean low water was 4.8 feet.

The barge Eureka No. 110 was 140 feet long and 32 feet wide and 15.8 feet from her deck to her bottom. She had four side strakes which extruded two inches from the side planks and were bevelled off near the ends. She had a raked bow. She drew 3 feet of water when she carried twenty-five tons. The bottom of the deck planking of the pier was said by petitioner's surveyor to be 10 or 10-½ feet from low water.

One of the Eureka No. 110's bow planks about nine feet below her deck was sprung two inches from its joint before the loading operation began and as the loading progressed to completion admitted the water that sank her. How or when this plank was sprung was not proved. Her bargee was negligent in failing to inspect before loading.

When the Coast Guard is notified of a sinking, its practice is to obtain a general location of the hulk. It never engages to act at or within a given time or to assume performance of anyone's duty to mark or guard a wreck until it is actually on the scene nor does it make any representations whatever upon which the informant may rely. It performs its statutory duty with a promptness reasonable to it and without consideration of the duties or necessities of civil parties.

The Berwind-White Coal Mining Company, owner of the Eureka No. 110, was negligent after the sinking in its failure to take any measures to avert collision with it, and in failing to buoy the wreck and in the failure of its bargee to notify his superior at 10:20 of the Eureka No. 110's sinking. Its employees, Jones and Noll, were not negligent in failing to notify the Coast Guard because they were entitled to rely on their expectation that their superior, Nelson, would act on the news of the sinking which they conveyed to him with reasonable promptness.

When the Eureka No. 110 was apposed to the dumper at pier 18 she was not seaworthy in that the 9th plank of the bow rake was sprung from the starboard side of the barge to the extent of two inches. The Court is unable to make any finding as to just when this plank had been sprung. The Eureka No. 110's bargee was negligent in failing to make any inspection of his barge which would readily have discovered this defect in her hull. We have found as a fact the existence of the sprung condition of the bow plank of the Eureka No. 110 from the testimony of Linquist. He said and the survey did too that it was the only defect in an otherwise good hull after the barge had been raised. We understand all the parties to agree that this defect was the necessary condition of the barge's sinking and to dispute only when and in what circumstances the injury was sustained.

If the supposition of petitioner's surveyor as to the cause of the barge's injury had any factual basis, it was susceptible to a demonstration of almost mathematical exactness. If the measurements and the estimates given by him were assumed with the tide heights and movements which are exact, the collision suggested as an explanation of the barge's condition could not

possibly have happened. In this calculation we have allowed a two foot freeboard to the barge, loaded. If the deck were even with the pier, as the bargee once said it was, the possibility of the collision would still be doubtful and that condition which is contrary to common sense was immediately contradicted by the bargee who gave the height of his freeboard as two feet. And this calculation does not take into account the barge's rake which would be effective as its motion created an angle to the pier or the dock's sheathing which would probably have affected the position of the bow when it reached the vicinity of the alleged out of position plank. It is certain that the condition of the barge's bow could not have been seen by the bargee on the dock before loading unless he leaned over the side of the dock. As a matter of fact he originally described his inspection thus: "I looked her over" and, if he looked at all, he was probably doing just that. Our findings reflect what testimony we have accepted.

To the owner of a vessel sunk in a navigable channel, because it is a menace to lives and property, the ordinary law of negligence attaches a duty to use reasonable means to avoid injury to others. What is reasonable is determined, as it always is, by the imminence of the danger to be averted and the means available to the owner and his employees. Part of the owner's duty is immediately, and until the wreck is removed, to buoy the wreck day and night and this duty has been embodied in the Wreck Statute. 33 U.S.C.A. § 409. Before that is done his obligation is to take reasonable measures to divert traffic from the wreck. Thus, in The Plymouth, 2 Cir., 225 F. 483, the owner of a wreck kept a tug by it to warn navigators from the time of its sinking until the Light House Department, at his request, placed a gas burning buoy upon it and was held to have performed his full duty. In The Douglas, 7 Prob.Div. 151, the owner was ignorant of the wreck and had no duty. His captain was rowed to an apparently remote place on the shore. His mate, taken off the wreck by a tug without authority to do more and we assume without funds, was held to have displayed reasonable care—rapid communications being rare in England in 1882—in having the tug

captain ask the Harbor Master to buoy the wreck.

The Coast Guard is a servant of the public and not a contractor when it marks the wreck and the owner is not liable for its negligence. The Plymouth, supra. The statutory discretionary authority of the Coast Guard to mark, 33 U.S.C.A. § 736, is of a quality superior to that of the owner's authority which is derived from his obligation and when exercised supersedes the owner's. The overriding of his authority so effected by actual effort of the Coast Guard suspends the owner's duty to mark from the inception of Coast Guard entry upon the task of marking. The Farragut, 2 Cir., 161 F.2d 966, where a Coast Guard vessel was at the scene. Since it might be thought unreasonable to have two vessels patrol the wreck scene, actual institution of patrol by the Coast Guard may suspend the owner's duty to patrol. The duty to patrol and to mark the wreck is otherwise nondelegable. The Anna M. Fahey, 2 Cir., 153 F. 866, where the circumstances did not include Coast Guard intervention.

In this case we were favored by testimony of a Coast Guard officer. He said the Coast Guard expects a wreck owner to care for approaching traffic with the means available to it until the Coast Guard does the buoying. The service of the Coast Guard is not engaged for any particular time but is rendered with a promptness reasonable to the Guard in the light of its own opportunity and the availability of its resources and without regard to the duty or necessities of the owner. This may explain why the Coast Guard required an hour and a half to get a boat across the Hudson River. The mere imparting to it of information that may stir into motion when it will and can move so irresponsible an actor is not performance of any immediate duty to avert damage before the wreck is buoyed. Every tort feasor but a malicious one hopes for a happy outcome of the chance he takes. If this is true of the owner, what weight can be given to this owner's plea that he heard another conveyed or would convey the news? The doctrine of The Plymouth, supra, that the owner must police his wreck until the Coast Guard buoys it states the

common law of negligence—nothing less will do.

In the Anna M. Fahey, supra, the Court fixed one hour as the reasonable time within which the owner's immediate duty to buoy a wreck in New York Bay must be met. In The Farragut, supra, the Court hesitated to forgive a two hour interval in the circumstances of that case. In this case the bargee knew at 10:20 P.M. that the barge had sunk. He did nothing but waste his time on the pier and he was negligent in failing to inform his owner, a minimum duty, or to take any action. Nelson, the owner's night superintendent, was the corporate owner in operation. Eastern S. S. Corp. v. Great Lakes Dredge & D. Co., 1 Cir., 256 F. 497; Erie Lighter 108, D. C., 250 F. 490. He knew about the wreck at 10:45 P.M. He did nothing.

The actionable negligence of petitioner is established when claimants proved their vessels ran on the unmarked wreck two to ten hours after it sank. It then became the owner's duty to go forward if it could and overcome the prima facie case. Its only proof is that some third person called the Coast Guard. It made no effort to prove the unavailability of recourses: a tug or a small boat for instance to police the wreck. The owner who was forgiven failure to use a tug to stand guard in Sullivan v. P. Sanford Ross, Inc., 2 Cir., 263 F. 348, had buoyed his wreck. If the cost be prohibitive which would seem absurd that is a matter of proof. So is any other excuse if there be one. As night superintendent we would impose the necessary authority on Nelson to do what was required in the circumstances. Nelson knew the fact that pier 18 was a day and night dock; that it averaged twenty-five barges daily which might well mean the entry to and leaving of the dock by twice as many vessels and he knew the barge was sunk in the channel that gave access to the dock. Never-the-less he did nothing. His negligence was "of a pronounced type" to use the phrase of the Judge in The Anna M. Fahey, supra, and it caused all the damage suffered by the claimants.

The Ann Marie Tracy arrived at the wreck at 12:35 on the morning of November 16th. We have found that the Coast Guard vessel was simultaneously arriving at the scene. The Coast Guard log has an entry: "12:05—arrived on patrol." The tug captain said that the Coast Guard boat passed him and entered the slip south of the pier, an indication we take it that it had then arrived and was seeking some more definite information about the proximate location of the wreck before instituting a patrol. It was stated in court that the person who made the entries in the Coast Guard log was in Massachusetts but no effort had been made to discover that fact or procure his presence until almost the last day of the trial although this case was tried almost three years after the petition was filed. The Coast Guard log has no entry of the Ann Marie Tracy's collision and we think this supports the tug captain's statement.

The second tug, the St. Charles and its barge, the Cleary No. 72, arrived at 5:10 A.M. on November 16th. We have found the damage to these vessels due to the negligence of the petitioner in failing to take measures to avert damage and to the negligence of the Coast Guard in giving incorrect directions to the tug captain. We have found that the Coast Guard, exercising a superior statutory authority, preempts the job of patrolling or marking a wreck while it is actually engaged in that task. Never-the-less the operation of the owner's negligence that preceded the Coast Guard's efforts continues. Petitioner is liable for all the damage to the St. Charles and the Cleary No. 72. The Mariska, 7 Cir., 107 F. 989; Benedict, Sixth Edition, Vol. 3, p. 185.

The same conclusion is necessary in the case of the Osprey. Here the Coast Guard had deserted its patrol without notice to the owner, the railroad or to its own office so far as we can find. Its log assigns engine trouble as an excuse but we have already found it incredible and at that the log does not say how long before the collision the engine trouble developed. Its desertion of its self-assumed and serious duty was negligence. Again in this instance we have joint tort feasors and the petitioner liable for all the loss. The varia-

tions in the tug captains' testimony as to where their vessels struck the wreck all estimated might be accounted for by the size of the barge. This was all matter for the petitioner to prove even after the coming of the Coast Guard.

We can find no reason that merits discussion to sustain the libels of the damaged tugs and the barge against the railroad. The Coast Guard's officer said that he thought the railroad dispatcher had assured him that the railroad would post a tug on the wreck to guard it until the Coast Guard's arrival but his recollection is so dim that we cannot find this representation was made as a fact. Therefore we do not feel called on to discuss the possibilities of such a representation if it had been made. No liability on any agency theory can be forced on the railroad through any alleged or real reliance on a statement by some unidentified person in a tug's pilot house that he would or did call the Coast Guard.

Finally we reach the petition for limitation of liability. Liability for collision with a wreck depends on the owner's negligence after the sinking even when that sinking was the result of his negligence. The Douglas, supra. Therefore liability is not limited when the duty to police the wreck or to buoy it as required by the Wreck Statute has not been fulfilled, since the duty to buoy attaches only to an informed owner and the duty to police, that we have found in this case, was its also and found its origin too in its knowledge. Eastern S.S. Corp. v. Great Lakes Dredge & D. Co., 1 Cir. 256 F. 497; The Snug Harbor, D.C., 53 F.2d 407. The reversal of the latter at 272 U.S. 675 had nothing to do with the merits. The additional negligence that we have attributed to the bargee is material in sustaining any judgment up to the value of the Eureka No. 110 and her freight.

The libel of Berwind-White Coal Mining Company against the Central Railroad of New Jersey is dismissed with costs. Judgment is awarded to Amboy Towboats, Inc. and Allen N. Spooner & Son, Inc., Tracy Towing Line, Inc. and Cleary Brothers against Berwind-White Coal Mining Company for the damage to their vessels with costs. The libels of Amboy Towboats,

Inc., Allen N. Spooner & Son, Inc., Tracy Towing Line and Cleary Brothers, against the Trustees of the Central Railroad of New Jersey are dismissed with costs. The petition of Berwind-White Coal Mining Company for limitation of liability is denied. The claim in the limitation proceedings of the Trustees of the Central Railroad of New Jersey for liability over becomes moot and is therefore dismissed. The libel of Cleary Brothers against the United States of America is dismissed. It follows that the petition of the United States, impleading the towboat St. Charles and the Trustees of the Central Railroad of New Jersey, is dismissed.