William P. WONG, Plaintiff,

v.

UTAH HOME FIRE INSURANCE COM-
PANY and Julian R. Yates,
Defendants.

Civ. No. 1571.

United States District Court
D. Hawaii.

Nov. 3, 1958.

Masanori Kushi, Hilo, Hawaii, for plaintiff.

Allen M. Stack, Honolulu, Hawaii, for defendant Utah Home Fire Ins. Co.

Eugene H. Beebe, Honolulu, Hawaii, for defendant Julian R. Yates.

HALL, District Judge.

The within action was commenced in the Circuit Court of the Territory of Hawaii as an action in personam against the defendant Utah Home Fire Insurance Company. On Motion of Utah, it was removed to the United States District Court under 28 U.S.C. § 1441. The grounds asserted for removal were that jurisdiction existed on account of diversity of citizenship between plaintiff and defendant Utah, and the case was one in admiralty.

After answer, plaintiff moved to join as a defendant an individual, Julian R. Yates, concerning whom there was no diversity of citizenship. In the Brief in support of its objection to the addition of Yates as a party, by amendment of the Complaint, defendant Utah did not touch upon the point that the court had jurisdiction of admiralty, but argued against such amendment solely on the ground that the lack of diversity divested the court of jurisdiction.

The court, after hearing arguments of parties, made an order granting leave to amend the Complaint joining Yates, after which the Complaint was amended, Yates was served, and a Motion to remand, or in the alternative, to dismiss, as to defendant Yates, was made, which was denied by the court.

The Order of the court permitting the joinder of Yates, and denying the Motion to remand is the law of the case, and it must be accepted as such. The Order was made by another Judge of this court, and I should add in passing, that I concur in his conclusions in respect to both matters.

The material facts, either as admitted by stipulation or as shown by a preponderance of the whole evidence, are: that the plaintiff was at all material times lawfully in occupancy and possession of certain private property known as the Hoakimau Fish pond in the City of Hilo, Hawaii; the pond is partially fed by a fresh water spring, is separated from the Waiola river by an uncemented stone wall about four feet thick, and the

water in the pond ebbs and flows with the tide; the property consists of about two and one-half acres of land, and the fish pond covers about two acres, and at all material times is and was used by plaintiff for growing mullet and aholeko, and harvesting them for market; the fish are stocked and are not spawned in the pond; the fishing vessel Kamaka was owned by defendant Julian R. Yates on and before March 9, 1957; on that date a tidal wave struck the Island of Hawaii in the port of Hilo in the Waiola river which is adjacent to the fish pond; as a result of the tidal wave, the vessel Kamaka, which was then tied up at the public pier approximately one-half mile from plaintiff's premises, was torn loose from its moorings, and was finally lodged in plaintiff's fish pond where it has since remained; no written claim of loss was made by Yates to Utah, but oral claim of loss was made on March 10, 1957, immediately after the tidal wave, to the broker who had placed the policy, and on that basis, defendant Utah, between March 10 and March 12, 1957, appointed a Marine surveyor, pursuant to the oral notice of loss, who on March 12, 1957, surveyed the wreck and reported to Utah on March 18, 1957, that the Kamaka was a constructive total loss; on the basis of that report, defendant Utah, on March 19, 1957, under the terms of its Marine Hull Policy No. 8367 and Renewal Policy No. 8221 in the principal sum of $10,000, paid to defendant Yates the full amount of $10,000 as called for in the policy, at which time defendant Yates executed a receipt providing, among other things, as follows:

"In consideration of the payment of $10,000 by the Utah Home Fire Insurance Company, it is hereby agreed and accepted that the full limit of Policy No. 8367 has been paid as a result of the Tidal Wave of March 9, 1957, and further that any salvage on said vessel is due to Utah Home Fire Insurance Company.";

on April 25, 1957, defendant Yates filed an affidavit to the effect that at the time of the loss of the Kamaka on March 9, 1957, he was then the sole owner of the Kamaka, and the only insurance in effect at the time of the loss was the above-mentioned policy with Utah Home Fire Insurance Company; on or about March 15, 1957, the plaintiff made an oral request to defendant Yates to remove the boat from his fish pond; Yates then had an offer by the owner of another boat to pull the wreck of the Kamaka from plaintiff's fish pond free of charge, but was advised by the Marine surveyor employed by defendant Utah (whom I hold to be an agent with full authority to act for Utah) that he had no right to do so as the boat was the property of Utah, and upon Yates' request to go upon the vessel and recover certain valuable gear, he was again advised by Utah that he had no authority to do so as the boat was the property of Utah.

Thereafter, the plaintiff, through his counsel, demanded of Alexander & Baldwin, Ltd., that the boat be immediately removed. That Corporation had appointed the Marine surveyor, and it is stipulated it was at all times the duly appointed, acting and authorized Agent of Utah, and that all acts and things done by it were done as such Agent, and binding on the defendant Utah. Later, on May 11, 1957, plaintiff again, in writing, demanded that they immediately remove the wreck of the Kamaka. At that time Alexander & Baldwin merely acknowledged receipt of the letter, and asked if plaintiff would accept the Kamaka if it were offered to him; in oral conversation between plaintiff's counsel and defendant Utah's agents, they offered to sell the wreck of the Kamaka to plaintiff for a consideration. The formal refusal by the plaintiff to buy the boat or to "accept it for free" was communicated to Utah by letter of plaintiff's counsel on May 27, 1957, to which they replied that they did not have the responsibility for removing the Kamaka from the fish pond. Thereupon, plaintiff filed this suit.

Shortly after the tidal wave and while in the office of Utah agents in Honolulu, Utah agents offered to sell the Kamaka to Yates for $200.

At the outset, it should be noted that the parties concede that the tidal wave which broke the Kamaka loose from its moorings and deposited it upon plaintiff's property was an act of God, and was done without privity and without knowledge of Yates, and without privity and knowledge of defendant Utah. But it should also be noted that the plaintiff seeks no damages for the injury done to his fish pond at the time the tidal wave deposited the Kamaka in his fish pond. At that time it broke the stone wall which was between plaintiff's fish pond and the Waiola river, which had been built by plaintiff in 1954 and 1955 at the cost of 3300 man-hours of labor and 20 truck loads of stone; and plaintiff, at the cost of 800 man-hours of labor, had finished off the sides of the pond by digging up mud and placing it on the banks. The plaintiff commenced to stock the pond with fingerlings in January, 1955. It takes from two and one-half to three years for the fingerlings to grow to marketable size which is about one pound.

After plaintiff's demands on both Yates and Utah to remove the wreck of the Kamaka, plaintiff re-constructed his stone wall, as it is necessary to have such a wall to prevent the mullet from swimming into the Waiola river and being lost from his fish pond.[1]

What the plaintiff seeks is the removal of the vessel as being a trespass after March 10, 1957, and damages for the failure of defendants to remove it. He does *not* seek any damages for the destruction of his stone wall, or the loss of fish, or other damage resulting from the tidal wave.

Both defendant Yates and defendant Utah, in their answers, deny they were the owner of the vessel, and claim that it had been abandoned.

Whether or not there would be liability for the trespass is not necessary to determine at this point as, under the evidence in the case, the court cannot sustain the claim that the vessel was abandoned. Defendant Yates executed his receipt, with the transfer to Utah, of the salvage rights, as above-mentioned. It is held in Craig v. Continental Insurance Company, 141 U.S. 638, 12 S.Ct. 97, 99, 35 L.Ed. 886, where an Insurance Company took possession of a vessel under its policy of insurance and paid a total loss, that the ownership of the vessel by the Insurance Company resulted from the abandonment by the owner to the Insurance Company and "was of the same character· as would have been her ownership by any person *who had purchased her* in her *then condition* from the former owner." To the same effect is The Tashmoo, Vol. 11–1937 A.M.C. 1536.

The defendant Yates is not now and has not been the owner of the vessel since March 19, 1957, when the defendant Utah paid Yates the full amount of the policy and thereafter exercised dominion over said vessel by offering to sell it to Yates and by offering to sell it to the plaintiff, and by refusing to let Yates recover certain gear from the vessel, and by refusing to let Yates remove the vessel from the fish pond. Since that date, defendant Utah has been and still is the owner of the vessel.

There is no showing of any damage to the plaintiff for trespass between the date of the tidal wave on March 9, 1957, and the date of the transfer of ownership to the defendant Utah on March 19, 1957, and in any event, such damage would be *de minimis*. Judgment must be against the plaintiff and for the defendant Yates, for the foregoing reasons.

The defendant Utah has raised the question of its right to limitation of liability to the value of the wreck of the

---

1. Plaintiff has a series of traps from the Waiola river and a canal adjacent to one side of the fish pond, which permits him to trap the small mullet which he later brings to maturity by feeding them in his fish pond.

**234**

Kamaka, under 46 U.S.C.A. § 183 et seq., in its Answer.

The cases which they cite in support of their right to raise this defense are: The Chickie, 3 Cir., 141 F.2d 80;[2] The Hawaiian, D.C., 38 F.Supp. 574, affirmed 4 Cir., 124 F.2d 45.

From the Opinions, it appears that each of these were cases where the petitioner filed suits *in rem* against the vessel, and the court sustained the right of the owners of the vessels, in such instance, to invoke the limitation of liability statutes. But the instant case is not one *in rem*. The custody of the *res* is not and has not ever been put or tendered to this court. It is a case *in personam*, and no authorities are cited, and I have found none on separate examination, which permits the limitation of liability statute, with the special procedures prescribed, to be invoked in a case in personam.

In Petition of Goulandris, D.C.S.D. N.Y., 50 F.Supp. 452, affirmed 2 Cir., 140 F.2d 780, a petition for limitation of liability under 46 U.S.C.A. § 183 et seq. was dismissed because of failure of the petitioner to comply with the procedural requirements of Section 185 of Title 46 U.S.C.A. and Admiralty Rule No. 51. The court there said [50 F.Supp. 453]:

> "The proceedings are entirely statutory, and to avail himself of the right, the owner must bring himself fully within the terms fixed by the statute. Standard Wholesale Phosphate & Acid Works v. Travelers Insurance Co., 4 Cir., 107 F.2d

373–376; In re W. E. Hedger Co., Inc., 2 Cir., 59 F.2d 982, 983. The word 'may' in this section means 'must'. Cantey v. McLain Line, D. C., 40 F.Supp. 887."

While the answer of Utah claiming the right to limit liability was filed within six months, no deposit, even of the $200 which Utah offered to take for the wreck, has been made in court; there has been no surrender of the *res*, or offer to transfer it to a trustee; and Utah has complied with none of the other procedures set up by the Statute or Admiralty Rule 51, 28 U.S.C.A.

It would appear, thus, that the defendant Utah as owner of the Kamaka after March 19, 1957, has not properly invoked the limitation of liability statutes.

■ However, assuming that they could raise such question of limitation of liability in their answer, it would appear that the limitation of liability statute cannot be invoked in such instance as the present.

Reference is again made to the earlier quotation from Craig v. Continental Insurance Company to the effect that a vessel's ownership by an Insurance Company, resulting from an abandonment to the Insurance Company by the owner, is "of the same character as would have been her ownership by any person who had *purchased her* in *her then condition* from the former owner." [141 U.S. 638, 12 S.Ct. 99.]

If a private party had purchased the Kamaka on March 19, 1957, lying as she

2. In The Chickie, supra, the court pointed out that the owners of the vessel had previously filed a petition for limitation of liability, and after filing of the suit in rem, invoked the limitation of liability statutes in their answer. In that case, the lower court proceeded, however, to give judgments in personam, and the Appellate Court pointed out that the suit was *in rem* only, and no judgment *in personam* could be given, and distinguishes a situation where the owner of a vessel files a suit for limitation of liability, in which event the court has ju-

risdiction not only in rem, but in personam.

This distinction is also pointed out in Hartford Accident & Indemnity Co. of Hartford v. Southern Pacific Co., 1927, 273 U.S. 207, at page 217, 47 S.Ct. 357, at page 359, 71 L.Ed. 612, where Chief Justice Taft said in speaking of petitions for limitation liability, "The jurisdiction of the admiralty court attaches *in rem* * * * by reason of the custody of the *res* put by the petitioner in it hands." Cited with approval in Petition of Goulandris, 2 Cir., 140 F.2d 780.

was in trespass on private property, which was then known as a fact by the purchaser, would the law permit such purchaser to escape liability for the trespass merely because she was thrown on the private property without the privity or knowledge of the previous owner? The mere statement of the question compels a negative answer.

The other cases dealing with the removal of wrecks are conflicting, but from an examination of the cases cited by Utah, where limitation of liability was permitted for failure to remove a wreck, the cost of the removal of the wreck was sought to be made not against the Insurance Company or a new owner who purchased the vessel in her "then" condition, but against the one who owned the vessel at the time of the sinking or wreck. And in each of these cases, the wrecks were left in navigable waters.[3]

Limitation of liability was not permitted in The Snug Harbor, D.C.N.Y.1931, 53 F.2d 407;[4] In re Berwind-White Coal Mining Co. (Allen N. Spooner & Sons v. Gardner), D.C.N.Y.1948, 80 F.Supp. 125.

In each of the last named cases a vessel had sunk in navigable waters, and thereafter other vessels had collided with them, causing damages. The court held that the duty of an owner, in connection with wrecks, to mark and remove sunken vessels, or permit removal by the Secretary of War, was a personal duty, and that the damages in question were occasioned by a wreck which had been submerged for some time after the sinking, whereas the limitation of liability is limited to limitation for disasters occurring on a particular voyage, and for such damage or loss as the owner sustained on the last voyage preceding the filing of the petition, or on the voyage on which the vessel is lost. The Snug Harbor, D.C., 53 F.2d 407, at page 412.

Such a situation is analogous to the one here. The voyage of the Kamaka ended when she was lodged on plaintiff's *private* fish pond, and as pointed out, the plaintiff is seeking no damages for the injury to his sea wall and fish pond as a result of the Kamaka being thrown upon his land. He is seeking damages only for trespass which occurred afterwards.

Furthermore, the trespass occurring after Utah took possession and title on March 19, 1957, was at all times with the privity and knowledge by Utah of the fact that the boat was in trespass upon plaintiff's private property.

It is the conclusion of the court that the defendant Utah is not entitled to apply the limitation of liability statute to the instant situation. And that the defendant Utah is liable in damages for trespass to the plaintiff since March 19, 1957, and is required in equity either to remove the wreck of the Kamaka without further damages, or to pay the plaintiff the cost of such removal.

The evidence on the question of damages to plaintiff since March 19, 1957, makes it difficult to assess the amount thereof.

The court viewed the premises twice in the presence of counsel and went upon the wreck. An oily mass was observed in the hold from which oil discoloration occurred. Oil discoloration was observed elsewhere in the pond, and oily marks observed on the hull. The plaintiff testified that oil from the wreck got on his screens used for trapping mullet from the Waiola river and from an adjoining canal, and also on the bamboo poles

3. The Irving F. Ross, D.C.Mass.1923, 8 F.2d 313; The Nassau, 2 Cir., 1928, 29 F.2d 37; The South Shore, 3 Cir., 1929, 35 F.2d 110, 111; The Central States, D.C.N.Y.1935, 9 F.Supp. 934; The City of Bangor, D.C.Mass.1936, 13 F.Supp. 648.

4. Eastern Transportation Co. v. United States, 1927, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472, involved earlier litigation concerning The Snug Harbor, and is not contrary to the decision of the District Court of the Eastern District of New York. The effect of that case is to hold that suit in admiralty permits suit in personam against the United States, as well as in rem.

spread through the pond for growing algae and other marine life upon which the fish feed, and that with low tide, the surface oil sticks to the banks and poles and prevents such growth, and that where the fish eat such growth with oil, they become "sick" and die.

He also testified that he fertilizes the pond with chemical fertilizer to promote such growth, but that the oil which has lodged on the poles, the banks and the rock wall with low tide partially prevents it, and on one occasion he cut off the oily banks and grass from a portion of the edge of the pond; that when he goes into the water of the pond, his skin and clothes become oily; that he feeds the fish ground grain by casting it on the surface, but that when it gets into the oil slicks, the fish won't eat it, and if they do, they get "sick" and die.

The plaintiff has found dead fish in small numbers from time to time. The fish which he markets bring him 90 cents per pound.

There is no doubt from the evidence, including the observation of the court, that the presence of the Kamaka in plaintiff's fish pond has caused damage in the past as he testified, and will in the future, not only as a result of the space it occupies, but because of the oil leaking from it, and because it presents an attractive nuisance which might cause personal injury to children.[5]

But the evidence as to the amount of *past* damage for fish killed by the oil is not such as would support an award for any amount, particularly in view of the fact that it takes two and one-half to three years to bring the fish to marketable size.

The evidence concerning the cost of removing the Kamaka is sharply contrasting.

Plaintiff produced a contractor as a witness who estimated the cost of removing the Kamaka at $5,165, and the cost of renewing the premises—scrubbing the stone wall and cleaning the oil off of the screen traps, and removing and renewing the bamboo in the pond, and removing the dirt which is impregnated with oil on the banks—at $4,000, or a total of about $9,165. Whereas, defendant Utah produced a witness who testified that he would remove the wreck of the Kamaka for $350 and the salvage.

That witness did not testify as to the amount he would receive as salvage, but it has been stipulated that if called, he would testify that it be $2,000 which he would expect to receive from the engine.

As above noted, the court viewed the premises and the wreck of the Kamaka twice in the presence of all the parties, and is satisfied that the cost of removing the wreck and renewing the premises lies somewhere between these widely divergent figures.

■ From the entire evidence, including the view of the premises, the court cannot conclude that the cost of cleaning the screens, banks and bamboo would be the sum of $4,000, but at best would be only a nominal sum which would be *de minimus*, and plaintiff is entitled to no judgment for that purpose.

■ In connection with the removal of the wreck, the court observed the difficulty which would be involved in getting machinery heavy enough to remove the wreck, either as a whole or in parts, with the engine, tanks and other gear to be removed separately, either upon or even near the premises, and for that reason, cannot accept the defendant's estimate of $350 as the cost of removing the wreck. Furthermore, the method proposed at that figure made no provision for preventing further spreading of the oil or damage to or loss of fish. To remove the wreck would involve the building of a temporary bridge across the canal, and the use of some means by which heavy machinery could be used

5. The plaintiff testified that on one occasion a number of boys broke his fence and climbed on the wrecked to play. Whether he or Utah would ultimately be held liable as a result of injury from an attractive nuisance is of no moment, as any lawyer worth his salt would sue both.

for lifting and pulling the wreck from the pond. Access for heavy machinery is made difficult because the pond is bounded on the mauka [6] side by boggy and swampy land with no access, and on the opposite side by a canal approximately 30 feet wide, and on the stone wall side by the Waiola river which is too shallow to permit a vessel large enough to carry the size of machinery necessary to be used in the removal of the Kamaka which is lodged near the sea wall on the mauka side of the pond. There is no means of access from the opposite end of the pond, without going through the pond or along the canal side with resulting damage of some consequence. But the estimate of defendant's witness, who is also a dealer in second-hand machinery and junk, is persuasive that at least $2,000 could be salvaged from the wreck.

The plaintiff's estimate of the cost of removal, while high, cannot be said to be so unreasonable as to be entirely disbelieved, particularly in view of the precautions and cost thereof, included in the figure of $5,165, to prevent further spreading of the oil and damage to the fish and to plaintiff's pond.

Accordingly, the plaintiff may have judgment, requiring defendant Utah to forthwith remove the wreck of the Kamaka, and in doing so to prevent the escape of the fish trapped in plaintiff's pond, and the further spreading or spilling of oil or oily substances on or in the waters of plaintiff's pond, or, in the alternative, to pay the plaintiff the sum of $3,165, which the evidence shows is the net cost of removing the Kamaka under the foregoing conditions, after deducting the sum of $2,000 which the court finds is the salvage value of the wreck.

This Memorandum will serve as Findings of Fact and Conclusions of Law, but not as Judgment which will be prepared and submitted by plaintiff, and after signing, entered by the Clerk.

---

6. I. e., towards the mountains, or away from the ocean side.