**Complaint of HARBOR TOWING CORPORATION, Owner of the Barge SHAMROCK For Exoneration From or Limitation of Liability.**

Civ. A. No. 71–20.

United States District Court, D. Maryland.

Nov. 10, 1971.

Randall C. Coleman, John T. Ward and Ober, Grimes & Shriver, Baltimore, Md., for Harbor Towing Corp.

Lewis A. Noonberg and Paul V. Niemeyer, Baltimore, Md., for claimant, Humble Oil & Refining Company (Richard P. Delaney, and Piper & Marbury, Baltimore, Md., of counsel).

Eugene I. Glazer and Barry R. Glazer, Baltimore, Md., for claimants, Ronald O'Bitz and Betty Jane O'Bitz.

George E. Brown, Jr., Baltimore, Md., for claimant, Cottage Grove Beach, Inc.

Francis B. Burch, Atty. Gen., Warren K. Rich, Thomas M. Downs, and Thomas Kenney, Jr., Asst. Attys. Gen. of Maryland for claimant, State of Maryland, Dept. of Natural Resources and the Maryland Port Authority.

NORTHROP, Chief Judge.

Harbor Towing Corporation has filed a petition in this court pursuant to 46 U.S.C. § 185, for limitation of liability that it may incur as a result of an oil spillage in the Baltimore harbor. In the present motions, two claimants, the State of Maryland, Department of Natural Resources and the Maryland Port Author-

ity, and Humble Oil & Refining Company, seek a ruling that their claims for monies expended in clean-up operations should not be subject to limitation.

Briefly stated, the facts as they are now alleged, appear as follows: At 12:-30 a. m. on July 12, 1970, petitioner's tug *Indian* towed the barge *Shamrock,* also owned by petitioner, to Humble Oil's Clinton Street terminal for loading with 7,000 barrels of heavy fuel oil. During the loading process, either through the negligence of Harbor Towing and/or Humble Oil, 68,000 gallons of oil were discharged into the harbor. As a result of this spill, substantial damage was done to the harbor, aquatic life and shoreline properties, and a large amount of money was expended by the State of Maryland and Humble Oil in clean-up operations. The present claims against Harbor Towing are as follows:

1. Maryland Port Authority, $26,-365.91 for clean-up expenses;

2. Department of Natural Resources, $2,000 for mortality to aquatic life;

3. Humble Oil, $425,000, of which $170,000 represents reimbursement for clean-up expenses;

4. Cottage Grove Beach, Inc., $19,-700.37 for property damage and loss of income; and

5. Betty Jane O'Bitz and Ronald O'Bitz, $50,000 compensatory and $1,-000,000 punitive for property damage. Both Harbor Towing and Humble Oil were prosecuted by the State and fined for breach of Md.Ann.Code art. 96A, § 29.

Harbor Towing then filed in this court a petition for exoneration from or limitation of liability, as above. After this court issued an ad interim stipulation in the sum of $33,352.67, the value of the barge and its freight, Humble Oil made a motion to increase the security by including the value of the tug. This court granted that motion in an opinion dated April 26, 1971.

Presently, the State has filed a "Motion to Disallow Limitation Liability or Alternatively to Exclude the State of Maryland's Claim from the Limitation Fund." Humble Oil has followed suit, asserting the State's position, since they will necessarily benefit thereby, and asserting that the expenses incurred by them in the clean-up should likewise not be subject to limitation.

■ Article 96A, § 29 of the Maryland Code clearly makes it a criminal offense to discharge oil into Maryland waters. Section 29B of the same article provides the State with a civil remedy to recover the costs of clean-up expenses:

> The Maryland Port Authority and the Department of Natural Resources shall charge and collect a compensatory fee from the person responsible for the oil spillage. This fee shall cover the cost of labor, equipment operation, and materials necessary to eliminate the residue of oil spillage and shall be retained by the agency charging the fee.

Section 29D of that same article empowers the Department of Natural Resources "to require the repair of any damage done and the restoration of water resources," including mortality to fish and other aquatic life.

The potential bar to the State's claim is 46 U.S.C. § 183 et seq. (1964), the Limitation of Liability Act. The language of that statute would appear to mandate limitation in every case "for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred . . ." with the exception of the situation where the loss occurs with the privity or knowledge of the owner. The movants have chosen not to rely on this exception. Rather, they have sought imposition of a narrow judicial exception at this stage of the proceedings, analogizing from cases decided under the Wreck Statute, 33 U.S.C. § 409 (1964), and arguing that the State's civil remedies impose on the owner a personal, non-delegatable obligation which is not protected by the limitation statute and that the limitation statute is inapplicable where the statute violated is of a criminal nature. Because the

Wreck Statute is so critical to the State's position, it will be set out in part:

It shall not be lawful . . . to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; . . . . And whenever a vessel, raft, or other craft is wrecked or sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States . . . .

Any violation of this section is to be enforced by criminal sanctions imposed by § 411 of Title 33.

The State has taken great care to set forth the cases which have held the Wreck Statute immune from limitation, and almost without exception they have followed a similar factual pattern: for a reason outside the knowledge or privity of the owner, the vessel is sunk; at this point, there appears to be little question but that limitation would apply; then, with knowledge of the sinking, the owner takes no steps to mark or remove the wreck; at this point, when an innocent vessel collides with it or where the owner refuses to remove the hulk, limitation is not allowed.[1]

Two rationales have resulted in this conclusion. The first is illustrated by In re Berwind-White Coal Mining Co., 80 F.Supp. 125 (S.D.N.Y.1948), in which three ships collided with a barge sunk by the owner's negligence, after the owner took no steps to effect removal. The court reconciled the two statutes, saying,

Therefore liability is not limited when the duty to police the wreck or buoy it as required by the Wreck Statute has not been fulfilled, *since the duty to buoy attaches only to an informed owner and the duty to police, . . . was its also and found its origin too in its knowledge.* [80 F.Supp. at 132] [Emphasis added].

Since the Limitation Statute is not available to an owner informed of the condition causing the loss, under this theory, conflict between the two statutes may never arise. If the owner has knowledge of the wreck, then any loss sustained subsequently to his gaining that knowledge must be deemed to have arisen within the exception announced in the Limitation Statute, and, consequently, limitation is not available. This theory is perhaps better explained by the Court in In re Pacific Far East Line, Inc., 314 F.Supp. 1339 (N.D.Cal.1970), where two ships, the *Guam Bear* and the *Esso Seattle,* collided in Apra Harbor, Guam, as a result of their joint negligence. The Navy subsequently removed the *Guam Bear* from the harbor and sank it. The Court held that the owners were jointly liable for the removal of the wreck and that the owner of the *Guam Bear* was not entitled to limitation against the removal expenses, saying:

[t]he statutory duty to diligently remove the wreck is a mandatory obligation personal to the owner and *the failure to so remove is within the privity and knowledge of the owner.* [314 F.Supp. at 1349] [Emphasis added].

---

1. One exception to this pattern is United States v. Hall, 63 F. 472 (1st Cir. 1894), where the vessel was purposefully sunk by the owners. The Court, in granting a bill in equity to compel the owners to remove the hulk under the predecessor of the Wreck Statute, noted that the act was voluntary and deliberate. It is implicit in such a conclusion that the Limitation Statute would have no application because of the privity or knowledge exception.

**1154**

Once again, while disallowing limitation, the Court operated consistently with the Statute. *See also* Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); In re Midland Enterprises, Inc., 296 F. Supp. 1356 (S.D.Ohio 1968).

This rationale may not be applied to the Maryland Statute vis-à-vis the Limitation Statute, for two reasons. The first is that, *notwithstanding the knowledge of the owner*, civil liability is imposed by Article 96A, § 29B. The conflict between the federal and the state law is apparent. In the present case, the owner was apparently unaware of the condition causing the loss. Looking at each statute in a vacuum, it appears that while the owner would be liable under the Maryland scheme, he would be expressly allowed limitation under the federal scheme. Any conflict of this sort must naturally be resolved in favor of the federal pronouncement by virtue of the Supremacy Clause. *See* Robins Dry Dock & Repair Co. v. Dahl, 266 U.S. 449, 45 S.Ct. 157, 69 L.Ed. 372 (1925); Frame v. City of New York, 34 F.Supp. 194 (S.D.N.Y.1940); In re Highland Navigation Corp., 24 F.2d 582 (S.D.N.Y. 1927); Gilmore and Black, The Law of Admiralty 43 (1957).

Secondly, it is obvious that, critical to the State's theory is the creation by the Wreck Statute of the personal, non-delegatable duty to perform an affirmative act, an act entirely separate and distinct from the original act causing the loss, the failure to do which results in the unlimited liability. Analogy to the Maryland statute is non-existent because that statute provides no affirmative duty, which when knowingly breached will impose additional liability. Section 28(a) (1) of Article 96A does provide that the Department of Water Resources "may issue an order requiring that necessary corrective action be taken . . . ." However, first it must be noted that the language of the statute does not direct the order at the violator. Secondly, it is apparent that, in distinguishing the Wreck Statute, under the Maryland statute an affirmative duty (to clean up) does not automatically come into existence upon the breach of the earlier duty (not to spill oil) but arises only upon an administrative order. As such, it cannot be said that the statute *creates* a personal, non-delegatable duty. The *only* duty existing upon breach of the duty not to spill *is* precisely the liability that is subject to limitation under the federal scheme. Only a great effort at mental legerdemain could perceive this as a duty of the ilk imposed by the Wreck Statute.

The second theory advanced by the State is illustrated by The Snug Harbor, 53 F.2d 407 (E.D.N.Y.1931). The *Snug Harbor* sank, and no effort was made by the owner to comply with the obligation imposed by the statute. The Court held that the Wreck Statute imposes a personal, non-delegatable duty, saying:

> The Wreck Statute . . . is not in conflict with [the Limitation Statute], but is in harmony with its provisions, for the duty imposed on the owner by the Wreck Statute is a personal one . . . .
>
> The Wreck Statute is a criminal statute . . . and the Limitation Statute cannot have any effect in limiting its provisions.
>
> Neglect alone predicated on the conduct of the owner does not preclude limitation of liability, but the violation of a statute criminal in its nature does preclude limitation of liability. [53 F.2d at 411].

Reference to the Wreck Statute clearly indicates its criminal nature. Naturally, any reliance on The Snug Harbor for the position advocated by the State necessarily assumes that the Maryland statute is penal or criminal in its nature. However, this is not at all apparent from the statutory scheme. Article 96A, § 29 makes it a criminal offense to discharge oil into Maryland waters. However, §§ 29B and 29D clearly provide the State with civil remedies. In fact, the language of the Act empowers the

State to collect "compensatory" fees, and the State, in its memorandum in support of this motion, characterizes this provision as "remedial." While it is clear that it is a criminal act to discharge oil into Maryland waters, just as it is a criminal act to voluntarily or carelessly sink a vessel in navigable channels under the Wreck Statute, it is not at all clear that the "duty" to clean up the spill must be effected or criminal sanctions will be imposed. On the other hand, it appears to a certainty that the action required under the Wreck Statute to protect others from injury, the breach of which was the basis for liability in The Snug Harbor, *supra*, is enforced by criminal sanctions, and that the duty to diligently remove the wreck is likewise enforced by the criminal penalties of § 411 of that statute. Thus, it is apparent that the Maryland statute, with no counterpart to this criminal responsibility, cannot be said to be a "criminal statute" and, therefore within the protection of The Snug Harbor.[2]

Secondly, even if the Maryland statute were held to be criminal in nature, it would still not follow that limitation must not be allowed. The barrier of the Supremacy Clause would still be present.

■ One further possibility, not briefed at this stage of the proceedings by counsel, exists to disallow limitation to Harbor Towing. In Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230 (5th Cir. 1969), cert. denied 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970), the Court held that limitation of liability was a personal defense to the owner of the vessel, and that under the Louisiana Direct Action Statute it was not available to the owner's insurer. *See also* In re Sincere Navigation Corp., 317 F.Supp. 1 (E.D.La.1970). In Olympic Towing, the plaintiff brought suit against the defendant and defendant's insurer pursuant to the Louisiana

Direct Action Statute, La.R.S. 22:655 (1964). Defendant then petitioned the court for limitation. The district court allowed limitation as to petitioner but denied it as to the insurer. The Fifth Circuit affirmed, reasoning that the "Limitation Act was designed to assist the maritime industry and that it was in no way intended to benefit the insurance industry." 419 F.2d at 238. The Court concluded:

> Thus it is patent that statutory limitation of liability is only available to a shipowner; the status of insurer is not covered by the public policy underlying the Limitation Act. We therefore hold that limitation of liability under the federal statute is a personal defense which cannot be availed of by an insurer under Louisiana law. [419 F.2d at 238].

■ While the general policy observations made by the Court are naturally applicable here, it must be noted that the Direct Action Statute provides a very different procedural context than the present one. Md.Ann.Code art. 48A, § 481 (1968) provides that, at least as regards policies issued in Maryland, no direct action will lie againt the insurer, but that an injured party may sue the insurer only when the judgment has been returned against the assured unsatisfied. The statute, moreover, does not provide for direct actions against insurers issuing policies outside this state. And as the Maryland Court of Appeals noted in Gorman v. St. Paul Fire and Marine Ins. Co., 210 Md. 1, 121 A.2d 812 (1956), the general principle is that "[i]n the absence of statute, it is generally held that direct action will not lie against the insurer, in advance of judgment against the insured."

Therefore, if the insurer of Harbor Towing issued the policy in Maryland, the Code would bar any direct action. If the policy were not issued in Mary-

---

2. It should be noted that, under the Wreck Statute, the sole statutory remedy is criminal. It was not until 1967 that the

Court in *Wyandotte* created, "by the sense of Congress," a civil remedy, which is arguably subject to limitation.

land, it would appear the sounder principle would likewise bar the action.

If it is determined that no direct action will lie, it will be extremely difficult to reason a theory to follow the lead of the Fifth Circuit. Since the only party to the suit will be Harbor Towing, the only judgment the Court may return is one consonant with the terms of the Limitation Act. Once that is satisfied, it would appear that the rights of the injured party would be extinguished. Only if the injured party were then allowed to sue the insurer would the Fifth Circuit's conclusion permit recovery.

However, it is possible that such a course would transgress the holding of the Supreme Court in Place v. Norwich & New York Transportation Co., 118 U.S. 468, 6 S.Ct. 1150, 30 L.Ed. 134 (1886). In that case, the precise question before the Court was whether the owner's insurance is an "interest in the vessel and her freight," and is therefore included within the limitation fund. The Court answered in the negative, saying:

> It is said to be unjust that the shipowner should be entirely indemnified for the loss of his vessel, and that the parties who have suffered loss from the collision by the fault of his employes should get nothing for their indemnity. This mode of contrasting the condition of the parties is fallacious. If the ship-owner is indemnified against loss, it is because he has seen fit to provide himself with insurance. The parties suffering loss from the collision could, if they chose, protect themselves in the same way. In fact they generally do so; and when they do, it becomes a question between their insurers and the ship-owner whether they or he shall have the benefit of his insurance. His insurers have to pay his loss; why should not the insurers of the other parties pay their loss? The truth is that the whole question, after all, comes back to this: whether a limited liability of ship-owners is consonant to public policy or not. Congress has declared that

it is, and they, and not we, are the judges of that question. [118 U.S. 495, 6 S.Ct. 1150, 1158].

In reality, to allow the second suit, i. e. against the insurer, would negate the effect of the Court's holding and, in effect, would allow the owner's insurance as an "interest" within the meaning of the Limitation Act.

Two recent cases have involved situations where, in suits against owners of vessels (there being no Direct Action Statute available to enable the injured party to sue the insurer directly) the courts have rejected claims that the owner should be entitled to limit only to the extent of his liability insurance. The precise question posed in Pettus v. Jones & Laughlin Steel Corp., 322 F. Supp. 1078 (W.D.Pa.1971), was "whether a shipowner may seek a limitation of liability to the value of an offending vessel when it carries liability insurance on the vessel in an amount in excess of the value of the vessel, ascertained immediately after the accident." After noting that the Limitation Act provided no express exception in this regard, the Court said:

> It would be difficult to read into Section 183 such an exception. The doctrine of limitation of liability is centuries old and antedates the institution of liability insurance. The advent of and widespread use of maritime liability insurance suggests that a re-examination of the doctrine of limited liability might be warranted. However, Congress codified the doctrine in 1851 and then reconsidered and amended the codification in 1935, well after the advent of the institution of liability insurance, without providing any exception to the applicability of the doctrine where liability insurance is carried by a ship-owner. *Id.* at 1081.

After distinguishing the cases that have disallowed assertion of the right to limit to insurers who were sued pursuant to a Direct Action Statute, the Court noted that no such right existed in Pennsylvania and that, therefore, the question presented involved only the right of the

shipowner to limit, "not the right of the insurer to do so."

Similarly, in In re Pacific Inland Navigation Co., Inc., 263 F.Supp. 915 (D.H.1967), in a suit against the owner of the vessel responsible for the collision which caused injury to the plaintiff's ship, plaintiff contended that the limitation fund should include the maximum amount of hull and machinery and public liability insurance carried by the offending vessel. After denying this contention, citing the authority of *Place, supra,* the court commented:

> Questions involving the application of personal injury liability insurance have posed some perplexing problems. Suffice it to say that Hawaii does not have a direct action statute like Louisiana's . . . .. No authority is cited wherein this type of insurance has been held includable in the limitation fund in the absence of such a statutory provision. *Id.* at 919.

One other situation has arisen involving insurance companies' participation in the action. In Wong v. Utah Home Fire Ins. Co., 167 F.Supp. 230 (D.H. 1958), after the vessel in question was thrown upon the property of the plaintiff by a tidal wave, it was declared a total loss by the insurer, the full amount of the policy was paid to the owner, and title was transferred to the insurance company. In a suit by the plaintiff for trespass, the insurance company was not entitled to limitation because (1) the injury, the trespass, occurred after the voyage, and (2) the fact that the boat was in trespass was within the privity and knowledge of the owner (the insurer). While this factual situation is not analogous to the present, the case does at least illustrate that insurers, at least as owners, have the same right to assert limitation as individual or corporate owners and are not denied this right because they are insurers.

■ Humble Oil has also made a motion to exclude its claim for clean-up expenses against Harbor Towing from limitation. It asserts that the public policy,

as illustrated by the Maryland statutory scheme, demands this result. Their theory is that, since the statute demands that the State be reimbursed for expenses incurred in clean-up, then a third party who incurs these expenses should likewise be able to demand reimbursement. If this is not the case, Humble reasons, the tortfeasor will avoid extended liability simply by refusing to initiate clean-up efforts.

Of course, the obvious flaw in Humble's argument is that the Maryland statute does not provide for such recovery by a private party, so that any claim that limitation should not apply is that much weaker than the State's position. Naturally, not even the public policy argument or statutory interpretation argument advanced by the State is available to Humble. Moreover, even if this court were to allow the State's claim without limitation, it would not follow that limitation should not be allowed against a third party. If no limitation is allowed as to the State, then it is true that no third party will undertake clean-up efforts. The burden will rest upon the State to marshal available resources and contract with third parties to facilitate operations. But surely the State is competent to handle this matter. At best, a third party's independent efforts might possibly speed up the clean-up to a slight degree, but more probably, this independent effort might lead to confusion and delay. It is not at all apparent how the public policy of the State would be served by such a ruling. This court will not flaunt the legislative function in such circumstances.

The problem presented by this case is both novel and difficult. And it is not to be disputed that this interpretation of the Limitation Act will not encourage shipowners to proceed to engage in clean-up efforts after their own tortious acts. However, this is a question that demands a delicate balancing of policy issues, the need to encourage capital investment in America's shipping industry against the right of the American people

to be free from the expense of the negligence of private industry. The resolution of a question as complex as this demands the scrutiny of the Congress, not the Judiciary.[3]

Therefore, the Motion to Disallow Limitation Liability or Alternatively to Exclude the State of Maryland's Claim from the Limitation Fund of the State of Maryland, Department of Natural Resources and the Maryland Port Authority, and Humble Oil's Motion to Disallow Limitation of Liability are hereby denied, for the reasons heretofore stated.

See also D.C. 335 F.Supp. 1162.

3. It is not irrelevant in this regard that Congress last term passed the Water Quality Improvement Act of 1970, 84 Stat. 91 (1970) by which it imposed civil liability for the costs of removal of oil discharged upon the responsible ship's owner. However, that liability is "not to exceed $100 per gross ton of vessel [$57,000 in the case of the Shamrock] or $14,000,000, whichever is lesser, except that where the United States can show that such discharge was the result of wilful negligence or wilful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs." It is, therefore, evident that, notwithstanding the declaration in the Act that it is the public policy of the United States that there should be no discharges of oil into the navigable waters of the United States, Congress still felt impelled to grant some protection to the maritime industry, albeit a somewhat lesser protection (under the Limitation Act liability is limited to the owner's "interest" in the vessel, in the present case, approximately $33,000), and still maintained a form of the exception in the Limitation Act.