## THE BUFFALO.

(Circuit Court of Appeals, Second Circuit. June 15, 1907.)

### No. 278.

1. MASTER AND SERVANT—INJURY TO SERVANT—LONGSHOREMAN EMPLOYED ON VESSEL.

The rule of the maritime law that a vessel is not liable in rem for an injury to a seaman through the negligence of the owner or master does not apply to the case of a longshoreman who is employed by the owner of a vessel to work thereon and is injured through being given an unsafe place to work; such cases being governed by the ordinary rules relating to master and servant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 211.]

2. SAME—UNSAFE PLACE TO WORK—FAILURE TO WARN SERVANT OF DANGER.

Libelant was a longshoreman employed in shoveling ore at the docks, and was sent by his employer, with others, on the employer's scow to assist in lightening an ore steamer which had gone aground. After the

steamer had been floated the scow proceeded to retransfer the ore which had been taken out, and libelant and others were sent on the scow to shovel ore into the buckets. These were moved by a hoist or derrick mounted on a revolving platform, which also could be moved on tracks the length of the scow. The work of reloading was commenced in the night, and libelant had never worked on the scow before, or on any one having such fore and aft movement of the derrick, and he was given no warning or instructions. While he was resting on his shovel after he had filed a bucket and it had swung away from him, the derrick was moved along the rails, he was struck from behind, and, throwing out his arm to save himself, it was run over and crushed. *Held,* that the injury was not due to the negligence of a fellow servant, it not appearing that the engineer operating the hoist was negligent, but to the failure of the master to warn libelant of the danger from the movement of the derrick, which rendered the place where he was set to work dangerous.

**8.** SHIPPING—LIMITATION OF LIABILITY—PARTS OF VESSEL.

A traveling steam hoist or derrick, mounted upon a fuel scow specially designed to be used with such a hoist, and from which, although removable, it had been removed but once in 14 years, is a part of the vessel, within the meaning of the limitation of liability statute (Rev. St. § 4283 [U. S. Comp. St. 1901, p. 2943]).

Appeal from the District Court of the United States for the Western District of New York.

For opinion below, see 148 Fed. 331.

H. H. McKeehan and Harvey L. Brown (Hoyt, Dustin & Kelley, of counsel), for appellants.

Lawrence J. Collins (Thos. C. Burke, of counsel), for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge. The Buffalo was a large, rectangular, flat-bottomed scow, intended for the lightering of coal. Her hold was divided into four compartments. Running fore and aft upon either side of her deck was a railroad track. A McMiler hoist or derrick mounted upon car wheels was placed on these tracks, so that it could run forward and backward the entire length of the tracks. This Mc-Miler hoist consisted of a house built upon a turntable and containing an engine, boiler, and machinery. From one part of the house extended the boom of the derrick, from the end of which the bucket was raised and lowered. The engineer who controlled the circular movements of the arm, the raising and lowering of the bucket, and the fore and aft movement of the entire structure on the rails was stationed in this house, which was inclosed on all sides with the exception of an opening on the side from which the boom extended. The engineer faced the opening, and the boom was in the direct line of his vision, so that he could observe the movement of the bucket as it was raised and lowered and could see that it was properly placed. When the boom revolved the whole structure upon the turntable revolved with it. By reason of the fore and aft movement of the McMiler hoist upon the rails it could be readily shifted, so that the bucket might operate in any desired compartment. This movement also subserved another purpose. It would sometimes happen that, when the bucket was in line above a particular compartment, the place outside the scow which it was necessary that the bucket should reach did not lie upon

the circle described by the radius of the revolving boom. It would then be necessary to supplement the movement of revolution by a fore and aft movement of a few feet upon each occasion when the bucket was raised or lowered. About 1 a. m. of September 30, 1904, the libelant, with a gang of men, was at work in the compartment furthest aft loading ore into the bucket. The bucket being loaded, libelant rested on his shovel, his back being towards the hoist, while the bucket rose and the boom swung over towards the steamship Venezuela, into which the ore was being delivered. In order to effect delivery of the bucket into the proper hatch of the steamer, the engineer moved the hoist a few feet further aft, it struck the libelant, and in trying to save himself from falling his arm was thrown over one of the rails and crushed by the moving wheel.

The appellants contend that there can be no recovery in rem against the scow under the decision of the Supreme Court in The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760. In answer to that contention it is sufficient to say that libelant was not a member of the crew of the scow. He had been employed for three weeks as an ore shoveler on the docks of the claimants in Buffalo. Informat'on having been received that the Venezuela was aground somewhere on the north shore of the lake, they hurried a number of their ore shovelers from the dock where they were at work aboard the scow, which was then empty, to assist the coal shovelers of the scow in lightening the steamer till she was got afloat and then in returning the ore on board of her. Libelant was merely a stevedore or longshoreman in the employ of appellants, and the case is to be determined by ordinary rules governing the relation of master and servant.

It is further contended that the proximate cause of the accident was the negligence of a fellow servant—the engineer. We are unable to find that the latter was guilty of any negligence. It is not shown that he moved the structure at any unaccustomed speed or in any unusual way. His entire attention was necessarily concentrated upon his own work, quite sufficient fully to occupy it, regulating the movements of the hoist, revolving turntable, and bucket, so as to move the ore from the one place to the other. If he carefully watched the bucket as it swung out board, he could not at the same time keep looking over his shoulder to see that the shovelers were keeping out of the way. He was entitled to assume that their avoidance of bucket, boom, or hoist would be secured, either by warning given to them or by their own attention to what was going on. Manifestly the compartment in which libelant was injured was an unsafe place to work, compared with the dock upon which he was accustomed to load buckets. His previous occupation had taught him that he must look out for a moving bucket and a swinging boom, and this he did, as the testimony shows. But for workers in the aft compartment on this occasion there was an additional peril, arising from the circumstance that the whole turntable and super-structure moved fore and aft over a part of the place where they were at work. He was put to work in this dangerous place after midnight, without a word of warning, without any caution to look out for any other movement than that of the bucket and the boom. This was negligence on the part of the master, and its consequences can be avoided

154 F.—52

only by showing that the circumstances are such that it is to be presumed that libelant must have assumed the risks of an employment whose dangers were obvious to any person of reasonable care and prudence.

But the testimony in this case will not sustain any defense either of assumption of risk or of contributory negligence. He knew of the danger from moving bucket and boom, testified that he watched them carefully, and no one disputes that testimony. He had never before worked on any such scow, with fore and aft movement to the revolving structure. He went on board the tug which took the scow over to the grounded steamer about noon of September 29th. During that trip the machinery was not in action. They reached the Venezuela and began discharging her ore about 2 p. m.; libelant working in the hold of the Venezuela. She floated at 10 p. m., whereupon the ore shovelers were transferred to the scow and put to work in No. 2 compartment, where they worked till it was emptied about 1 a. m. They then walked around the hoist to No. 4 compartment (aft) to begin work there. There is no testimony to show that during the three hours they were at work in No. 2 the hoist was moved fore and aft over any part of that compartment. Apparently that compartment and the hatch of the steamer were in such position relative to each other that it was not necessary to move anything but the boom and bucket. Certainly up to the time that libelant went to work in No. 4 there had been nothing to warn him that a danger additional to those which attended his work on the docks lurked in its dim-lit obscurity. Nor had he been long enough in No. 4 to receive such warning through the teachings of experience. He was struck while the second or third bucketful was swinging aloft. While we do not think the master was under any obligation to have a man specially stationed to call out when the hoist moved aft after each swing outwards of the boom, as the swing of the boom would itself indicate the time when such movement might be looked for, we are satisfied it was his duty to give warning generally to those whom he put to work there at midnight of dangers which their past experience might not have led them to expect and which at that hour were certainly not obvious. The findings of the district judge as to the merits of the case are therefore affirmed.

The libel was filed against the "lighter or fuel scow Buffalo, her rig, engines, boilers, boats, tackle, buckets, etc." The owners claimed the benefit of the limitation of liability acts, and the district judge held that they were entitled thereto. In assessing the valuation of the interest of the owners in the vessel there was included $3,000 for "engines and machinery," which is assigned as error. From the description of the scow already given it is apparent that it is an easy matter to remove the "McMiler hoist." It would be necessary only to jack the hoist up and run it off on rails properly placed, and the hoist bears no part in the navigation of the vessel. Nevertheless the hoist is a useful and most important part of this variety of lighter, or "fuel scow," as it is called. Her engineer testified that during 14 years' service the hoist had been removed only once. She was built expressly for use with such a hoist. The object for which she was put to service was the combination of her carrying capacity with ma-

chinery and power, resident in herself, which could fill up or empty her several compartments without any assistance from outside. The statute reads:

"The liability of the owner of any vessel * * * shall in no case exceed the amount or value of the interest of such owner in such vessel and her freight then pending." Rev. St. § 4283 [U. S. Comp. St. 1901, p. 2943].

The appellants rely principally upon a decision in the First Circuit (Swift v. Brownell, Holmes, 497, Fed. Cas. No. 13,695), in which it was held that the word "ship," as used in the statute, did not include, in the case of a whaler, the "whaling outfits, consisting of whaling gear, casks, provisions, and supplies for the crew and trading, known as 'slops.'" The court found that these were "appurtenances" of a whaling vessel, and that, because Congress had not used the word "appurtenances," which appeared in the English limitation of liability statute, it was its evident intention not to include that which is "no part of the ship in the language of merchants, but only appurtenant to it as necessary for a special voyage or adventure." This case, which was decided in 1875, gives a narrow construction to the clause. Subsequently (1893) the Supreme Court held that the word "freight," used in the same clause, was not to be given a narrow or technical definition. The court says:

"The real object of the act in question was to limit the liability of vessel owners to their interest in the adventure. Hence, in assessing the value of the ship, the custom has been to include all that belongs to the ship and may be presumed to be the property of the owner, not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances, comprising whatever is on board for the object of the voyage, belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries." The Main v. Williams, 152 U. S. 131, 14 Sup. Ct. 486, 38 L. Ed. 381.

Although the precise question was not before the court in the case of The Main, which dealt only with passage money and prepaid freight, the general rule of interpretation laid down in that case should be followed, and the clause construed broadly to cover what the owners have at risk on the vessel for the object of the adventure. Upon such a construction the McMiler hoist should be included with the vessel.

The decree of the District Court is affirmed, with interest and costs.

TOWNSEND, Circuit Judge, heard argument, participated in the consultations, and voted to affirm for the reasons stated, but did not see this opinion.