The MT STANDARD OILER her engines, tackle, apparel and appurtenances, and Standard Oil Company of California, a Corp., Appellant,

v.

HAMBURG–AMERICA LINE, a Corp., Appellee.

No. 21551.

United States Court of Appeals Ninth Circuit.

Jan. 11, 1968.

Rehearing Denied Feb. 23, 1968.

William R. Buxton (argued), Pillsbury, Madison & Sutro, S. J. Madden, Thomas E. Haven, Gordon L. Graham, San Francisco, Cal., for appellant.

Walter M. Schey (argued), Graham, James & Rolph, San Francisco, Cal., for appellee.

Before CHAMBERS, POPE and HAMLEY, Circuit Judges.

POPE, Circuit Judge.

This proceeding arose out of a collision in Suisun Bay between the M/V "VOGTLAND", a German Flag vessel of the Hamburg-America Line, a corporation, and the M/T "STANDARD OILER", owned by the Standard Oil Company of California.

Suisun Bay can be described as a lower extension of the Sacramento River and San Joaquin River, tributary to San Pablo Bay and San Francisco Bay.[1] The Standard Oiler was enroute to Antioch on the San Joaquin River in the direction of Stockton and the Vogtland was enroute from Stockton to Oakland. At the time in question the Coast Guard had established a temporary 300 foot wide

---

1. Suisun Bay is described in the Pacific Coast section of United States Coast Pilot 7, U. S. Department of Commerce Coast and Geodetic Survey, Ninth (1963) Edition, as follows, p. 133: "Suisun Bay is a broad shallow body of water with marshy shores and filled with numerous marshy islands, many of which have been reclaimed and are now under cultivation. It is practically the delta of the Sacramento and San Joaquin Rivers which empty into the eastern part of the bay. Two narrow winding channels lead to the mouths of the rivers. They are marked by buoys, daybeacons, and lights. The rivers and the channels near the mouths have been improved by the Government to increase the depth, remove obstructions, and provide relief during freshet seasons. A Federal project provides for a main channel 30 feet deep through the bay to the San Joaquin River. The channel is maintained at or near project depth. The bay is used by many light-draft vessels having local knowledge. Strangers should take a pilot if bound above Benicia."

channel in a portion of the Bay extending east and west and marked by two temporary buoys, designated as 18A and 19A, lighted and flashing red and green respectively. These markings and the location of the 300 foot channel are indicated on the rough sketch attached hereto.

*Hamburg-America Line*

The collision occurred during the evening of October 31, 1963, within this marked channel to which all traffic through the Suisun Bay was confined. In the action below each party charged the other with fault as the proximate cause of the collision. The trial court found that the Standard Oiler and its crew were negligent and solely responsible for the collision and the damages resulting therefrom.

■■ We have concluded that under the rule of McAllister v. United States, 348 U.S. 19, we must accept the findings of the trial court as to the negligence on the part of the Standard Oiler, but we are of the view that a mistake has been made in not finding the Vogtland also guilty of negligence which contributed to and was a proximate cause of the collision, and that the findings of the trial court in that respect are clearly erroneous.

The Vogtland first came in sight of the buoys and of the lights of the Standard Oiler about 8:45 P.M. It was then dark but the pilot of the Vogtland described the night as being "abnormally" clear. He had a clear view of mountains 30 miles away and as he emerged from a narrow channel coming from the San Joaquin River into the main Suisun Bay there was no obstruction as all the land was flat and he could see other ships approaching toward or from the vicinity of the buoy-marked channel. The distance from that point to the buoys was 1.3 nautical miles. The pilot of the Vogtland had then left the narrow channel, referred to as the New York Slough, in which limited speed was required, and he turned his telegraph direction to "full ahead." Half way between that point and the buoys he passed another ship, the TARANGER, moving in the opposite direction, and after that passing he changed his course from 266 to 260. The first course had him headed directly for buoy 19A and the second one had him headed directly for buoy 18A. After he had passed the Taranger, the pilot of the Vogtland gave a two blast signal. At that time he continued to observe the approach of the Standard Oiler toward the marked channel coming from the opposite direction. He testified that "it was definitely possible that we would meet in the vicinity of the buoys."

The two blast signal indicated that the Vogtland wished to pass the Standard Oiler on a starboard to starboard course. The pilot of the Vogtland testified that almost immediately he received a response from the Standard Oiler with two blasts of its whistle indicating that it agreed to a starboard to starboard passing. All the personnel aboard the Standard Oiler denied that any such response had been made, but other witnesses on the Taranger testified that they heard the double blast signal from the Vogtland and the response from the Standard Oiler. The trial court found that the response was made as the witnesses on the Vogtland testified and we of course necessarily accept that finding. McAllister v. United States, supra.

Shortly thereafter the Standard Oiler blew a rapid succession of four or more quick blasts which was a danger signal, and the Standard Oiler immediately reversed its engines. The effect of this reversal of engines was to throw the Standard Oiler on a collision course with the Vogtland which was still driving ahead full speed in the direction of the 18A buoy. It is plain that the trial judge could find that the Standard Oiler was at fault for having first consented to the starboard to starboard passing and then changing its attitude, as indicated, which amounted to a refusal to proceed with the starboard to starboard passing. We must therefore accept the findings of the trial judge of fault on the part of the Standard Oiler. These findings are not clearly erroneous.

On the other hand, the evidence shows that after the Vogtland came out of the New York Slough, it threw its engines into full speed ahead. At this point, as indicated, it had a clear view of the vicinity of the two buoys. It could see the approaching Taranger and also see the lights of the Standard Oiler although the pilot of the Vogtland had to ask the

Taranger pilot as they passed what those lights were. After the Vogtland passed the Taranger and changed course to 260 from 266, when he gave the two blasts, the pilot testified: "Well we put her on a full bell. You can assume the speed is increasing as we go. The ship has a top speed of 14 or 15 knots. And it takes some time for the hull to get up to that speed." There was an ebb tide of about 1½ knots flowing in the same direction taken by the Vogtland.

As the attached diagram shows, we are convinced that the trial court was mistaken in failing to take into account the angle at which the Vogtland was approaching these buoys and the danger involved in its speed and direction. The Vogtland was 500 feet long and 65 feet wide. An old time pilot familiar with this area, called as an expert witness, noted this in his testimony when he said that the 260 course which was taken following the passing of the Taranger "would make her come into the approach of these buoys at a very oblique angle and she couldn't start executing any turn unless she got up to a point where she can clear this 19A buoy and she would have all her turning to execute on the opening itself to come through the temporary channel."

The testimony shows that at the moment when the alarm or danger signal was sounded by the Standard Oiler, which was a much smaller vessel, 200 feet long, 30 feet wide, the Vogtland was approximately at the location shown on the diagram. At that moment the Standard Oiler was, according to some of the testimony at point 3, and according to other testimony at point 7, but in either event the 500 foot long Vogtland would necessarily then appear to the Standard Oiler to be practically completely filling the 300 foot channel. This is something that the pilot of the Vogtland should have anticipated. At the moment of the collision the Vogtland was still at full speed ahead as the pilot testified that he was utilizing his speed to promote a swing to the left. At that moment the pilot was putting the ship "on hard left to minimize or avoid a collision."

We think it plain that a mistake was made in not finding the Vogtland at fault in attempting to pass the other vessel at this speed in this manner in this narrow channel. Article 25 of the navigation rules for inland waters (33 U.S.C. § 210) provides that in such a location a vessel like the Vogtland, when it is practicable, shall keep to the starboard of the channel.[2] It is true that Article 27 (33 U.S.C. § 212) provides departure from such rules when the same is "necessary" in order to avoid immediate danger. See Marshall Field & Co. v. United States, 2 Cir., 48 F.2d 763, 765, and see Griffin on Collision § 228, p. 516. Such a situation did not exist here. There was nothing "necessary" about the decision of the pilot of the Vogtland to pass through this narrow channel without keeping to that side of the channel which lay on its starboard.[3] In proposing the starboard to starboard passing, knowing the passing might come in this narrow channel, the Vogtland undertook the risk of the venture.[4]

2. "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel. June 7, 1897, c. 4, § 1, 30 Stat. 101."

3. "The exception to the statutory requirement * * of a port to port passing finds its proper application, not in convenience, but in necessity." Marshall Field & Co. v. United States, supra.

4. "The Hokendaqua * * * proposed a starboard to starboard crossing, and in so proposing she undertook the risk of the venture. * * * The May's assent did not absolve the Hokendaqua from this risk * * *." The Hokendaqua, 2 Cir., 251 F. 562, 563. And see Griffin on Collision: "This rule (Article 25) * * * is a particular application of the general principle laid down in Article 18, that meeting vessels shall pass port to port; and the same general considerations of prudent navigation apply under it." (§ 36, p. 88.)

Indeed, the pilot of the Vogtland testified as follows: "Q. Was this not a place of meeting that you would consider would require caution? A. Yes. It would require caution any time you would run that close to another vessel. It would be—Q. Would you make any particular effort to avoid meeting a vessel in between those two buoys? A. Yes, I probably would. Q. Did you make any effort to avoid meeting the 'Standard Oiler' between those two buoys that night? A. Not specifically." He also testified: "Q. Well, at the time just prior to giving the two-blast signal did you consider slowing down? A. No, because the Standard Oiler laid well to my north side and it seemed amply safe to pass starboard to starboard." He answered "No" to the following question: "Q. From the time that you saw the Standard Oiler, first saw the Standard Oiler, did you ever consider slowing down to avoid the possibility of meeting the vessel between the two buoys?" We cannot conclude but that the signal to pass starboard to starboard, which is contrary to Article 18 of the Rules (33 U.S.C. § 203), was given for the mere convenience of the Vogtland in permitting it to negotiate the narrow channel at full speed and without slowing down so as to permit the Standard Oiler to pass through the channel before the Vogtland reached it.[5] We think it plain that had the Vogtland sufficiently reduced its speed, either the Standard Oiler could have passed through the channel ahead of it, or both vessels could have passed port to port.

Accordingly we hold that the trial court should have found the Vogtland at fault and that its fault in attempting to pass in the manner it did in the narrow channel was a proximate cause of the collision and resulting injuries. The judgment is reversed and the cause remanded with directions to the trial court to assess the damages on the basis of fault on the part of both vessels.

## ON PETITION FOR REHEARING

### PER CURIAM.

Appellee has moved for a rehearing basing the motion in large part upon an alleged defect in the diagram which was made a part of our opinion. It may well be that our picturization of the VOGTLAND in the diagram was mistaken in showing it wider than it actually is. In an appendix to the motion the appellee undertakes to correct that fault in our drawing. A recheck of the distances satisfies us that we showed the Vogtland wider than it actually is but the appellee's diagram shows it too narrow.

Our opinion did not purport to assert that it would be impossible for the two vessels to pass in the 300 foot channel. What we purported to say was that as the situation appeared to the STANDARD OILER such a passage would have seemed to be unsafe particularly because of the angle at which the Vogtland was approaching the passage and particularly because of the speed at which it was proceeding. From the position of the Standard Oiler all that would be visible of the Vogtland would be its starboard side. In describing what the Standard Oiler could see the width of the Vogtland would be immaterial.

If we accept as more accurate the diagram of the appellee, we still think that the maneuvers of the Vogtland approached recklessness. We are much impressed by the fact that something caused the Standard Oiler to sound the alarm. What caused that was an obvious dangerous situation created by the Vogt-

5. After the court's findings had been filed, the court denied a motion to amend the findings, and in the course of an opinion then filed, the court said: "There can be no argument made with respondents' statement, 'Had she [the Vogtland] slowed down at any time on her way towards the gate, the Standard Oiler would have been safely through and the collision would not have occurred.' Such a statement, however, does not establish negligence or proximate cause." Under the circumstances here present, we think the conclusion of the court, so stated, was clearly erroneous.

land. The width of the Vogtland is not important as compared with the speed and the angle at which it was proceeding.

The petition for rehearing is denied.