In the Matter of the Complaint of PACIFIC FAR EAST LINE, INC., a corporation, for Exoneration from or Limitation of Liability as Owner of the American Flag STEAMSHIP GUAM BEAR.

No. 47077.

United States District Court,
N. D. California.

June 15, 1970.

Dorr, Cooper & Hays, John Hays, William K. Mordock, San Francisco, Cal., for Pacific Far East Line, Inc.

Lillick, McHose, Wheat, Adams & Charles, Edward D. Ransom, Willard G. Gilson, San Francisco, Cal., for Humble Oil and Refining Co.

Derby, Cook, Quinby & Tweedt, Stanley J. Cook, Robert H. Thede, San Francisco, Cal., for Air Engineering Co. et al., owners and insurers of commercial cargo aboard the Guam Bear.

U. S. Department of Justice, Admiralty & Shipping Section, John F. Meadows, Gerald A. Falbo, San Francisco, Cal., for the United States.

## OPINION

BEEKS, District Judge * :

Shortly prior to 0630 [1], local time, January 14, 1967, the American tanker ESSO SEATTLE, owned and operated by Humble Oil and Refining Co. (hereinafter Humble), and the American freighter GUAM BEAR, owned and operated by Pacific Far East Line, Inc. (hereinafter PFE), were in collision just outside the entrance to Apra Harbor, located on the west side of the Island of Guam. ESSO SEATTLE is a single screw vessel, 634.6 feet in length, 84 foot in breadth, 47 foot in depth, and of 18,600 h.p. GUAM BEAR was also a single screw vessel, 459 feet in length, 63.2 foot in breadth, 37.6 foot in depth, and of 6,000 h.p.

Apra Harbor is a Naval Base under the control and operation of the U. S. Navy. It is over two miles deep, east to west, and is entered from the west. The entrance range through the entrance of the harbor is 084° [2] inbound, 264° outbound. The entrance is bounded on the north by the tip of Glass Breakwater and on the south by Orote Island and the tip of Orote Peninsula. There are shallows immediately adjacent to the breakwater and the peninsula, and the deep water entrance to the harbor is marked by two buoys approximately 900 feet apart on a roughly northerly-southerly line. The northerly buoy, off the end of the breakwater, is identified as #1 and the southerly buoy, near Orote Peninsula, as #2.

The collision occurred a short distance outside of a line between the entrance buoys, fairly close to and northwest of buoy #2. The collision occurred before official sunrise, but during the last few minutes prior to the collision sufficient daylight prevailed that each vessel could see the other as well as neighboring landmarks and buoys. Prior to that time the masthead and range lights of each vessel were visible to and observed by the other. At all times material wind and current were negligible.

On the morning of the collision, GUAM BEAR having passed north of Guam Island was inbound to Apra Harbor from Wake Island. Upon leaving Wake, she had radioed her estimated time of arrival at Guam as 0600 on January 14, 1967. At 0530 Orote Point light bore 192° 3.3 miles [3] distant. At this time GUAM BEAR slowed her engine and at 0540 stopped it to await the beginning of daylight before proceeding further. During this time GUAM BEAR's radio officer made numerous unsuccessful attempts to contact Navy Radio Center on 2716 kcs.

ESSO SEATTLE had arrived at Apra Harbor with a cargo of jet fuel and was berthed at Pier H. Her departure was originally scheduled at 0600 on January 14, 1967 following discharge of her cargo. Such departure was advanced to 0530. The reason for the advanced departure time was the anticipated arrival of GUAM BEAR at 0600. The pilot, an employee of the U. S. Navy, arrived on board ESSO SEATTLE some time between 0520 and 0538. After undocking and turning ESSO SEATTLE, the pilot, who had the conn, gave a full ahead engine order and such helm orders as were necessary to bring her on or very near to the departure range, heading for the harbor entrance. This full ahead bell was given at 0612½. At the time of departure ESSO SEATTLE had not been "gas-freed."

At a point approximately one half mile short of the entrance, the pilot disembarked onto tug #419 an accompanying Navy harbor tug and ESSO SEATTLE was thereafter navigated by her master, while the tug lay-to inside the entrance, awaiting the entrance of

---

* Honorable William T. Beeks, United States District Judge, Western District of Washington, Northern Division, sitting by designation.

1. All times are approximate.

2. All courses are true and those hereinafter stated approximate.

3. All distances are approximate.

GUAM BEAR so that the pilot could board and pilot her to her berth.

During the time from undocking of ESSO SEATTLE to the time the pilot left the bridge, the pilot, the master and third mate of ESSO SEATTLE, from her bridge, observed the masthead and range lights of GUAM BEAR at sea across the breakwater and the pilot advised the master of ESSO SEATTLE that the lights observed were probably those of GUAM BEAR, which would probably wait outside the entrance until ESSO SEATTLE had exited before herself coming in through the entrance.

At 0606, as day started to break, GUAM BEAR had drifted to a position north of the harbor entrance. Her master then felt there was sufficient visibility to enter the harbor. He could see the masthead and range lights and the green sidelight of ESSO SEATTLE. He ordered full ahead (maneuvering speed) and proceeded on a course of 214°. GUAM BEAR maintained this course and speed until 0617 when her master ordered left rudder to turn toward the harbor entrance. This turn was completed at 0618, at which time GUAM BEAR came to a heading of 125° and directly toward the harbor entrance. At 0618 GUAM BEAR was 2600 yards from #1 buoy on a bearing of 123°.

At 0618 the speed of ESSO SEATTLE was reduced to slow ahead to permit the pilot to disembark. When the pilot left the bridge he was accompanied to the main deck by the third mate and boarded tug 419 at 0623.

Upon observing the departure of the pilot and the maneuvering of tug 419 for such purpose from the port wing of the bridge ESSO SEATTLE's master returned from the port wing of the bridge to the engine room telegraph in the pilot house and rang up full ahead. Very shortly after the pilot left ESSO SEATTLE, her master saw GUAM BEAR clear the end of the breakwater, approximately three points on his starboard bow, and saw that she was then proceeding at a substantial rate of speed

on a course toward the harbor entrance which, if projected, would cross ESSO SEATTLE's outbound course. At this time he seemingly realized for the first time that GUAM BEAR was not going to wait outside but was coming on into the harbor, and so remarked to his third mate. At 0623 ESSO SEATTLE was 1000 yards inside the harbor, headed midway between the entrance buoys. ESSO SEATTLE traveled 1700 yards from the time the pilot left the bridge to the time he was off the vessel.

On seeing GUAM BEAR's bow appearing from behind Glass Breakwater, ESSO SEATTLE's master blew two blasts, applied left rudder and told the helmsman to steer close to and just to the north of buoy #2. No response was heard from GUAM BEAR, and after waiting for 20–25 seconds, ESSO SEATTLE repeated the two-blast signal. Her first two-blast signal having gone unanswered ESSO SEATTLE was uncertain as to the intentions of GUAM BEAR, but failed to blow the danger signal, stop her engine, and/or go full astern. Instead, she repeated her two-blast signal.

At the time of the second two-blast signal by ESSO SEATTLE, GUAM BEAR blew a signal and continued on her course. The evidence is in conflict as to the nature of the signal by GUAM BEAR. Humble contended that GUAM BEAR blew a two-blast signal, while PFE contended that GUAM BEAR blew a signal of four short blasts. Upon all the evidence it is more probable and logical that GUAM BEAR blew four blasts, the first two of which harmonized with ESSO SEATTLE's two-blast signal.

For one minute after GUAM BEAR's signal, ESSO SEATTLE continued under a full ahead bell on the last course aforementioned and her master watched GUAM BEAR closely. During this period the relative bearing of GUAM BEAR remained constant and the master of ESSO SEATTLE saw that she was not turning left to meet and pass ESSO SEATTLE starboard to starboard at the entrance. The master of ESSO SEAT-

TLE then put his engine full astern and ordered hard right rudder. At this moment, however, the bow of GUAM BEAR was almost dead ahead and collision was then inevitable. The full astern and hard right rudder were ordered solely in the hope of lessening the angle of impact and the force thereof.

After her one and only signal GUAM BEAR first stopped her engine for a short period, then reversed momentarily, then went full ahead under hard right rudder which was almost immediately changed to hard left in the hope of swinging her stern to the right, away from oncoming ESSO SEATTLE.

At 0626 [4] at a point northwesterly of and fairly close to buoy #2 the stem of ESSO SEATTLE struck the port side of GUAM BEAR between #4 and #5 hatches, well aft of midships at an oblique angle of between 30 and 45 degrees, and the bow of ESSO SEATTLE penetrated GUAM BEAR almost to her midline. At the moment of impact the speed of ESSO SEATTLE was approximately 9 knots and that of GUAM BEAR approximately 10 knots.

Subsequent to the collision GUAM BEAR was aided into Apra Harbor by Navy tugs and was beached, in a navigable channel, at right angles to the shore with her bow on the beach and her stern deeply submerged, thus blocking use of Piers D and H and creating an obstruction to navigation. Some cargo was removed from the forward holds of GUAM BEAR, after which the Navy caused her to be towed to sea and sunk.

As a proximate result of the collision: (1) GUAM BEAR became and was a total loss. (2) A large amount of GUAM BEAR's cargo, some owned by United States and some owned by private parties, was totally lost or damaged. (3) PFE incurred expense to remove salvable cargo from the forward holds of the vessel. (4) Humble sustained loss of use and expense in connection with repair of damage sustained by ESSO SEATTLE in the collision.

At all times relevant herein, and for several years prior to January 14, 1967, Apra Harbor was controlled by U. S. Navy in such matters as scheduling arrivals and departures and assigning tugs, pilots and berths. All commercial vessels were required to be piloted by Navy-employed pilots from the inner harbor to a place in the outer harbor short of the entrance or, in the case of inbound vessels, from a spot inside the entrance to the intended berth in the inner harbor. No pilotage was required or provided through the entrance in either direction.

The advance of ESSO SEATTLE's departure time from 0600 to 0530 was arranged by Navy for its own convenience and efficiency, so that one Navy tug and pilot could take ESSO SEATTLE out to the entrance and then bring GUAM BEAR back into the inner harbor, thereby avoiding the necessity of a tug and pilot proceeding to the entrance and bringing GUAM BEAR in while another tug and pilot were used to take ESSO SEATTLE out. It was thus the intent and purpose of Navy so to arrange the schedule that ESSO SEATTLE would leave the harbor at about the same time that GUAM BEAR arrived at the entrance.

Before leaving ESSO SEATTLE, the pilot requested the operator of tug 419 to contact Navy control on shore by radio and request the latter to inform GUAM BEAR that ESSO SEATTLE was exiting, a fact which the master of GUAM BEAR had known as early as 0606. The tug's radio was set on 3216 kcs which was the frequency guarded by the watch-standers in Harbor Control and the tug base. By Navy local regulation, the frequency of 2716 kcs was to be used for communications between ships and shore, and all ships were required to guard that frequency.

4.   Collision occurred at 0625½ according to ESSO SEATTLE's logs and bell books, at 0626 according to GUAM BEAR's master, and at 0627 according to GUAM BEAR's engine room bell book.

This frequency of 2716 kcs was not guarded by or available to the Harbor Control office, but was operated and guarded by a separate Navy facility, Radio Center. A direct telephone line connected the Radio Center office with the Harbor Control office.

Under the procedure which the pilot attempted to invoke for communicating with GUAM BEAR the tug operator would radio Harbor Control on 3216 kcs, Control would telephone to Radio, and the latter would then radio GUAM BEAR on 2716 kcs.

After the pilot left ESSO SEATTLE and boarded the accompanying tug, he was informed by the tug operator that Control reported they had tried to "raise" GUAM BEAR by radio and had been unable to do so. In fact, the tug operator had not passed on the pilot's instructions to Control and no effort whatever had been or was ever made by Control or by Radio Center to radio the pilot's message to GUAM BEAR.

After learning from the tug operator that his intended message to GUAM BEAR had not been transmitted, the pilot made no effort to so inform the master of ESSO SEATTLE or to have the shore radio facilities try again to "raise" GUAM BEAR.

During the period from 0530 to 0600 GUAM BEAR several times tried to contact Navy Radio Center on 2716 kcs, but was unable to get a response. At this time the 2716 kcs receiving set of Radio Center was not operative due to the failure of equipment or personnel, or both. GUAM BEAR's radio was in good working order and was both sending and receiving on 2716 kcs.

The wreck of GUAM BEAR was valueless. Certain equipment, stores and supplies of a value as yet undetermined, and certain refrigerated cargo containers of a value of $72,000.00 were recovered from the wreck of GUAM BEAR, and there was "pending freight" at the time of termination of the voyage of $245,547.92.

On January 20, 1967, PFE notified Cargo, both Private and Government, that GUAM BEAR was a total loss, but that PFE had directed a salvage expert to proceed with a cargo salvage operation, the cost of which would be initially advanced by PFE, but would ultimately be payable in general average by Cargo interests in proportion to the value saved.

Private Cargo moved under PFE's standard form of bill of lading. Government Cargo moved under shipping contract No. MST 47 entered into between PFE and the Department of Navy, Military Sea Transportation Service.

Both the PFE bills of lading and contract MST 47 contained, among other provisions, customary forms of Amended Jason Clause and General Average Clause. The PFE bills of lading contained a customary form of "freight-earned" clause but contract MST 47 did not.

On January 9, 1963 a determination was made by the Chief of the Army Corps of Engineers that the Corps had jurisdiction to exercise the functions delegated to it under the Rivers and Harbors Act in Guam Harbor. Acting pursuant to this assumed jurisdiction a wreck was in that year removed from Guam Harbor by the Navy but at the instance and request of the Corps of Engineers, for which the Navy was paid by the Corps from funds allotted to it for the purpose of exercising its functions under said Act.

On February 28, 1967 PFE notified Army Engineers, Washington, D. C. and Navy Command, Guam, that it abandoned GUAM BEAR pursuant to 33 U. S.C. § 414. The abandonment was never accepted. Neither prior nor subsequent to said notice of abandonment did PFE commence or undertake the removal of the wreck of GUAM BEAR.

In July 1967 pursuant to the provisions of 33 U.S.C. § 409 Navy Ship Repair Facility, Guam, a funded activity allotted a sum of money with which to operate during each fiscal year, removed

the wreck from said channel, hauled it out to sea and sunk it.

Prior to the removal of the wreck of GUAM BEAR by said Navy Facility no determination was made by Army Corps of Engineers as to the necessity, advisability or manner of removing or otherwise dealing with said wreck and none of the proceedings or determinations referred to in 33 CFR § 209.190 were instituted prior to removal.

Prior to the collision the navigation of ESSO SEATTLE was in waters governed by Inland rules and that of GUAM BEAR in waters governed by International rules.

■ ESSO SEATTLE was negligently navigated in the following respects, each of which proximately contributed to cause the collision:

1. She failed to maintain a competent and careful lookout, in violation of 33 U.S.C. § 221,[5] in that for a five-minute period from 0618 to 0623 there was no one on ESSO SEATTLE observing GUAM BEAR at all and no officer conning ESSO SEATTLE. During that period the third mate of ESSO SEATTLE accompanied the pilot from the bridge to the main deck, port side, where the latter descended a jacob's ladder and got onto the tug after it had maneuvered alongside the moving ESSO SEATTLE, and during that time the master of ESSO SEATTLE was on the port wing of the bridge, outside the pilot house, watching the pilot disembark. During this period of time the only person in the pilot house was the helmsman, who was keeping the bow of his ship headed midway between the entrance buoys and no one was observing GUAM BEAR.

2. She at no time took bearings on GUAM BEAR to ascertain the latter's course or speed or to check whether the bearing was changing or remaining constant. See 33 U.S.C. § 201.[6] In fact, the courses of the two vessels were such that the bearing of GUAM BEAR was constant for more than five minutes prior to the collision and prudent seamanship by those on the bridge of ESSO SEATTLE, would have discovered this well before the latter's master finally became aware that GUAM BEAR was proceeding on into Guam Harbor.

3. Being in inland waters, approaching the harbor entrance [7] through which her master knew the inbound vessel would pass, she failed to keep to her starboard side of the channel and instead altered course to her left side thereof, in violation of 33 U.S.C. § 210.[8]

---

5. § 221. *Usual additional precautions required generally (Art. 29)*
Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

6. § 201. *Suggestion for ascertainment of risk of collision*
Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist.

7. The entrance to Apra Harbor is a narrow channel. The evidence indicates that all traffic moves in and out of the entrance and its immediate area. The opening is very similar to the First Narrows, the entrance to the harbor of Vancouver, B. C., Canada, which this Court held to be a narrow channel in United States v. Motor Ship Hoyanger, 265 F.Supp. 730 (W.D.Wash.1967). See Tug New York Co. v. The Robin Doncaster, 130 F.Supp. 136 (E.D.Penn.1955), aff'd 233 F.2d 889 (3rd Cir., 1956) ; Skibs A/S Siljestad v. S/S Mathew Luckenbach, 215 F.Supp. 667 (D.C.N.Y.), aff'd 324 F.2d 563 (2nd Cir., 1963).

8. § 210. *Steam vessel in narrow channel (Art. 25)*
In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel. In narrow channels a steam vessel of less than sixty-five feet in length shall not hamper the safe passage of a vessel which can navigate only inside that channel.

See MT Standard Oiler v. Hamburg-America Line, 396 F.2d 115 (9th Cir., 1968).

4. She altered course to her left upon blowing a two-blast signal before she had received a response from the other vessel, in violation of 33 U.S.C. § 203. See 33 CFR § 80.03 [9] and Esso Standard Oil Co. v. The President Garfield, 279 F.2d 540 (2nd Cir., 1960); Marshall Field & Co. v. United States, 48 F.2d 763 (2nd Cir., 1931).

5. Hearing no answer to her first two-blast signal, being in doubt as to the intention of the other vessel, observing that the two vessels were on collision courses, she negligently failed to take any avoiding action, particularly to reverse or blow the danger signal, until it was too late to prevent or avoid the collision, in violation of 33 U.S.C. § 203, and instead repeated her two-blast signal. See Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 332 F.2d 211 (4th Cir., 1964); Parker Bros. & Co. v. De Forest, 221 F.2d 377 (5th Cir., 1955).

6. Aside from any specific statutory rules of the road, all of the above acts and omissions of ESSO SEATTLE were negligent and were not in accordance with prudent navigation.

There were no special circumstances which required ESSO SEATTLE to proceed as she did or which would excuse or justify what she did.

■ GUAM BEAR was negligently navigated in the following respects, each

of which proximately contributed to cause the collision:

1. She failed to use prudent seamanship in appraising the course and speed of ESSO SEATTLE in that she failed to keep a proper and competent lookout in violation of 33 U.S.C. § 1091 [10] and failed to watch the compass bearing of the exiting ESSO SEATTLE pursuant to 33 U.S.C. § 1078,[11] as a result of which she erroneously concluded that she could pass through the harbor entrance while ESSO SEATTLE was still inside the harbor. As Judge Learned Hand stated in Ocean S. S. Co. of Savannah v. United States, 38 F.2d 782, 784 (2nd Cir., 1930):

A constant bearing is a sure sign of danger, made so by the rules at their very outset; a danger signal which should put every mariner on guard. To be sure, it may not call for an immediate change of course or speed, but *it must always be remembered that it is the risk of collision, not the collision itself*, that masters must avoid. (Emphasis added.)

2. In failing to reduce headway and otherwise bring herself under control when there was uncertainty as to the course or movements of ESSO SEATTLE. As said in Federal Insurance Company v. S.S. Royalton, 312 F.2d 671, 676 (6th Cir., 1963):

It is well settled that if a steamer be approaching another vessel * * * whose position or movements are uncertain, she is bound to stop until the course and intentions of the other vessel be ascertained with certainty.

---

9. § 80.03 *Signals.*

    \*     \*     \*     \*     \*

    (4) Two short blasts of the whistle signify intention to direct course to own port.

10. § 1091. *Usual additional precautions required generally (Rule 29)*

Nothing in sections 1061–1094 of this title shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by

the ordinary practice of seamen, or by the special circumstances of the case.

11. § 1078. *General considerations*

1. In obeying and construing sections 1078–1089 of this title, any action taken should be positive, in ample time, and with due regard to the observance of good seamanship.

2. Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist.

and in The New York, 175 U.S. 187, 207, 20 S.Ct. 67, 75, 44 L.Ed. 126, 135 (1899):

> The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. We cannot impress upon the masters of steam vessels too insistently the necessity of caution in passing or crossing the course of other vessels in constricted channels.

3. By continuing to approach the harbor entrance on a diagonal course from the northwest at a time she knew ESSO SEATTLE was exiting, GUAM BEAR created a substantially greater risk of collision than an approach on the entrance range would have involved. It should have been apparent to GUAM BEAR that the vessels would meet in the narrow entrance. She was in the open sea, there was adequate room for maneuver and prudent navigation required that she wait outside the entrance until ESSO SEATTLE had completed her exit.[12]

One of counsel has characterized the navigation of ESSO SEATTLE as a hopeless miscalculation and misjudgment of the entire situation. The Court agrees, but would add that it aptly describes the navigation of both vessels, and that the fault of each contributed equally to the collision.

■ The United States was not negligent or at fault in any respect which proximately contributed thereto.

It was not negligent to schedule the arrival and departure of the vessels as

was done or for the pilot to express his opinion that GUAM BEAR would probably stay outside the entrance until ESSO SEATTLE departed. While the Government may have been negligent in failing to complete the pilot's requested transmission by reason of failure of equipment or personnel or both, a successful transmission would have conveyed to the master of GUAM BEAR only that which he already knew.

At the time of the collision, certain regulations had been promulgated by the Commanding Officer, U. S. Naval Station, Guam, known as "Port Regulations, SOPA (Admin.) Instructions for Apra Harbor, Guam." Humble and Private Cargo contend that Article 213(2) of said Regulations required GUAM BEAR to wait outside until ESSO SEATTLE had cleared the harbor entrance and that GUAM BEAR was unseaworthy within the privity and knowledge of owner because a copy of the regulations was not aboard.

The regulations were promulgated pursuant to 50 U.S.C. § 797, a penal statute. Under date of February 9, 1966, they were amended by the Navy operations officer by adding to Article 213 thereof a subparagraph (2) reading:

> "2. Outbound ships have the right of way over inbound ships insofar as priority of movement in the harbor. This Art. is not to be construed as superceding [sic] the Rules of the Road."[13]

Article 213(2) was not published in the Federal Register prior to its promulgation, nor is it mentioned in the "Sailing Directions for the Pacific Islands," (H.O.Pub. 82), issued by the United States Naval Oceanographic Office, as

---

12. See Griffin, The American Law of Collision, p. 98 (1949).

13. The Order of the Commanding Officer, U.S. Naval Station, Guam, dated October 20, 1964, promulgating Article 2132, after reciting that he exercises delegated security control over the Naval installation pursuant to 50 U.S.C. § 797, provides in pertinent part:

> (1) Failure to comply with the regulations may result in imprisonment for not more than one year or a fine not to exceed $5,000.00 or both.
> (2) The regulations shall not be retained on any vessel after departure.

said Sailing Directions existed at the time of the collision or have subsequently been amended.

No copy of the aforesaid Port Regulations was aboard GUAM BEAR at the time of the collision.[14] Presence of a copy aboard GUAM BEAR would have been in direct violation of a specific order of said Commanding Officer.[15]

Neither the absence of the aforesaid Navy Port Regulations from aboard GUAM BEAR nor the master's ignorance of Article 213(2) thereof rendered GUAM BEAR unseaworthy or was a proximate cause of the collision, nor did it create a privilege on the part of outbound vessels or impose a burden on inbound vessels, or otherwise govern the navigation of vessels.[16]

In addition, Article 213(2) is ambiguous and uncertain. Being penal in nature it must be strictly construed, Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959); LeMasters v. United States, 378 F.2d 262 (9th Cir., 1967); United States for Use of Getz Bros. & Co. v. Markowitz Bros. (Del.), Inc., 383 F.2d 595 (9th Cir., 1967), and should not be expanded beyond its plain language, United States v. Braverman, 373 U.S. 405, 83 S.Ct. 1370, 10 L.Ed.2d 444 (1963); See Sutherland, 2 Statutes and Statutory Construction § 3301 *et seq.* So construed it is clear that it applies only to priority of movement *in the harbor* and in no way attempts to control activities at the entrance. It can only relate to the internal management of the Naval installation on Guam, including such things as assignment of tugs and pilots, and the Court finds it was intended for such

purpose. Even so, the regulation is ineffective. It was not published in the Federal Register as required by 5 U.S.C. § 552 and 44 U.S.C. § 1505. The omission is fatal. Hotch v. United States, 212 F.2d 280, 14 Alaska 594 (9th Cir., 1954).

Continued performance of the contracts of carriage represented by PFE's bills of lading under which non-Government cargo was carried aboard GUAM BEAR was prevented, frustrated and rendered impossible by the constructive total loss of GUAM BEAR short of its destination through causes for which PFE is not responsible, by virtue of which PFE is entitled to recover from such non-Government cargo as was saved its properly adjusted proportionate share of all salvage and special charges properly incurred in getting the vessel from point of collision to the shore and in discharging cargos therefrom, all in accordance with Paragraph 10 of said bills of lading (the Amended Jason clause).

Paragraph 15 of said bills of lading (the "Freight-Earned" clause) entitles PFE to collect and retain all freight chargeable according to the applicable tariff, and no portion of said freight is returnable to the shippers of non-Government cargos, either directly or as a credit against cargo's share of the salvage and special charges payable as aforesaid. Mitsubishi Shoji Kaisha, Limited v. Societe Purfina Maritime, 133 F.2d 552 (9th Cir., 1942), cert. denied 318 U.S. 781, 63 S.Ct. 858, 87 L.Ed. 1148 (1943).

The joint negligence of PFE and Humble having caused the sinking

---

14. At the time of the collision the content of Article 213(2) was unknown to the master of GUAM BEAR. It was also unknown to the master of ESSO SEATTLE, the Navy pilot assigned to ESSO SEATTLE, anyone in the employ of PFE, or any officer or administrative employee of Pacific Far East Line (Guam) Inc.

15. *Supra* note 13. The prohibition was also set forth in the printed instructions on the front cover of the book containing the regulations.

16. Rules relating to privilege and burden or otherwise affecting navigation can be established only by special rule promulgated by the Commandant of the Coast Guard and published, after hearing, in the Code of Federal Regulations pursuant to 33 U.S.C. § 157.

of GUAM BEAR and the unlawful obstruction of a navigable channel within the meaning and intent of 33 U.S.C. § 409, and the Government having removed the wreck of GUAM BEAR, both parties are jointly and severally liable to United States for the expense of removing such wreck and sinking it at sea.

Wyandotte Trans. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L. Ed.2d 407 (1967), clearly established that those negligently causing the sinking of a vessel, resulting in the obstruction of navigable waters, are personally liable to the United States for the expense of removing the wreck.

■■■ As a matter of first impression the Court must decide whether PFE is entitled to limit against such wreck removal expenses pursuant to 46 U.S.C. § 183.[17] The answer must be negative.[18]

■■■ At all times material, Section 15 of the Rivers and Harbors Act (33 U.S.C. § 409), applied to the navigable waters of Apra Harbor.[19] The statutory duty to diligently remove the wreck[20] is a mandatory obligation personal to the owner and the failure to so remove is within the privity and knowledge of the owner.[21] Of particular relevance is the following statement in Humble Oil & Refining Co. v. The Tug Crochet, 422 F.2d 602, 608 (5th Cir., 1970):

> With the right of abandonment eliminated from its terms, Section 15 makes it plain that the owner of a vessel negligently wrecked in a navigable channel does not have the option which belongs to the sovereign, of either buoying and lighting *or* removing such a wreck. Cargill, because of its negligence, had and continues to have the double duty (1) to immediately buoy and light the wreck *and* (2) to commence the immediate removal of the same and prosecute such removal diligently. While lighting and marking by the United States relieves a private party of this function, it does not relieve the owner of a negligently sunk wreck of his additional *immediate and continuing duty* to remove the obstruction to navigation. (Emphasis added.)

There is nothing in the Rivers and Harbors Act (33 U.S.C. § 401 *et seq.*) or any other statute of the United States

---

17. In *Wyandotte* at Footnote 17 the Court indicated that it did not pass on the applicability of the Limitation Act.

18. See the British case, The Stonedale, (The Court of Appeal) 2 All E. R. 170 (1954), affirmed (House of Lords) 2 All E. R. 689 (1955) and the Canadian case, Marwell Equip. Ltd. v. Vancouver Tugboat Co., 26 D.L.R.2d 80 (1960). For related cases see generally The Snug Harbor, 53 F.2d 407 (E.D.N.Y.1931); Wong v. Utah Home Fire Insurance Co., 167 F.Supp. 230 (D.Haw.1958); In re Midland Enterprises, Inc., 296 F.Supp. 1356, 1364 (S.D.Ohio, 1968). Dissenting opinion of Browning, J., United States v. Bethlehem Steel Corp., 319 F.2d 512 (9th Cir., 1963).

19. See 48 U.S.C. § 1421(c); Report of the Commission on the Application of Federal Laws to Guam. House Doc. No. 212, 82nd Congress 1st Session, p. 21; The Civil Code of the Territory of Guam, Art. II, § 970 (1953); Captain Arzt, 2 Marine Laws 84.

20. 33 U.S.C. § 409. *Obstruction of navigable waters by vessels; floating timber;*

*marking and removal of sunken vessels* * * * and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418, and 502 of this title.

21. 46 U.S.C. § 183. *Amount of liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel"*
(a) The liability of the owner of any vessel * * * for any * * * loss * * * of any * * * merchandise shipped * * * on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

known to the Court which restricts the liability created by 33 U.S.C. § 409 to wreck removals undertaken by and at the expense of the Corps of Engineers.[22] The expense of removing the wreck was borne by the United States. It would be highly inequitable for one who tortiously causes an obstruction and willfully refuses to remove the same, to be able to thereafter limit his liability for the reason that the removal was accomplished by an agency of the government other than the Corps of Engineers.

The plaintiffs in actions Nos. 46465, 47482, 47483, 51873 and 69423, all being claimants for cargo loss or damage in action No. 47077, are entitled to a decree against Humble for all provable damage sustained by them. By virtue of the contracts of carriage and the provisions of 46 U.S.C. § 1304(2) (a) PFE is exonerated from liability to these plaintiffs/claimants.

A second matter of first impression is tendered regarding the inclusion by PFE of the value of the aforementioned refrigerated cargo containers as a part of and belonging to GUAM BEAR for the purpose of limitation of liability.

These containers were owned by PFE and utilized by it for its own convenience as carrying receptacles for cargo received by it, but were removable from the vessel and interchangeable with other PFE-owned containers and not formally identified with any particular vessel in the PFE fleet or assigned to any such vessel, except by coincidence for a particular voyage.

The containers were part of the vessel's appurtenances for the object of the voyage and were part of what the owner risked on the vessel for the object of the adventure. Thus, the value thereof must be included in the interest of PFE in GUAM BEAR for limitation purposes. "The Main" v. Williams, 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894); The Walter A. Luckenbach, 14 F.2d 100 (9th Cir., 1926); The Buffalo, 154 F. 815 (2nd Cir., 1907). An analogy can also be drawn from the Flotilla Doctrine as expressed in Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724, 727 (5th Cir., 1967).

Thus except with respect to the wreck removal expenses aforesaid, which are not within the purview of 46 U.S.C. § 183(a), PFE is entitled to limit all liability adjudged against it herein.

The issues as to the amount of damages sustained by each party are reserved for later trial and disposition if the parties are unable to agree thereon. The issues as to the amount of General Average Salvage and/or Special Charges payable to PFE by the Government and as to the amount of freight payable to PFE by the Government, if disputed, are subject to determination pursuant to the Disputes Clause (Article 19) of Contract MST 47, unless otherwise arranged by Government counsel.

This opinion shall constitute the Court's findings of fact and conclusions of law under F.R.Civ.P. Rule 52(a).

---

22. See footnote 16 in *Wyandotte*.